STATE OF NORTH CAROLINA v. GEORGE WILLIAM ADAMS

No. 25A91

· (Filed 8 May 1992)

1. **Evidence and Witnesses § 3107 (NCI4th)— homicide—prior inconsistent statement—error cured by like testimony amplified on cross-examination**

   The trial court in a homicide prosecution erred in admitting for corroborative purposes hearsay testimony by a witness regarding statements made to him by defendant's brother pertaining to the circumstances surrounding how the victim was shot where these statements were inconsistent with the brother's trial testimony, but such error was cured when testimony of like import was amplified on cross-examination by defense counsel.

   **Am Jur 2d, Trial §§ 418, 420.**

2. **Homicide § 22 (NCI4th); Evidence and Witnesses § 683 (NCI4th)— capital trial—jury deadlocked on punishment— case not transformed into noncapital—general objection to corroborating testimony**

   A first degree murder case prosecuted capitally was not transformed into a noncapital case when the jury deadlocked as to whether the death penalty was proper and a sentence of life imprisonment was imposed. Defendant was thus not required to object to each allegedly objectionable portion of a corroborating witness's testimony but could rely upon a general objection made only once at the outset of the testimony.

   **Am Jur 2d, Criminal Law § 26; Appeal and Error § 723.**

3. **Evidence and Witnesses § 3105 (NCI4th)— hearsay— corroboration—substantial similarity to trial testimony**

   Assuming arguendo that a witness's testimony that defendant's brother showed him the alleged murder weapon was hearsay, this evidence was properly admitted for corroborative purposes, notwithstanding the brother contended on direct examination that he did not show the gun to the witness, because there was "substantial similarity" between this testimony and

testimony by defendant's brother on cross-examination that the witness had in fact seen the weapon.

**Am Jur 2d, Trial §§ 418, 420.**

4. **Homicide § 268 (NCI4th) — armed robbery — felony murder — acting in concert — sufficiency of evidence**
    There was sufficient evidence that defendant acted in concert in the robbery and murder of the victim to support submission of a felony murder charge to the jury where the evidence tended to show that defendant and his brother were in need of quick money in that defendant was being pressed to make payments on a television and videocassette recorder and defendant needed money to purchase necessities for his children; at the time defendant and his brother drove to the victim's residence, they had already broken into another residence where they stole a pistol, television satellite equipment, and some coins; after stopping the car once to fire the stolen pistol, they next arrived at the home of the victim, for whom defendant's brother had worked in the past; defendant's brother was aware that the victim carried money on his person, including one or more hundred dollar bills; after the victim was shot with the stolen pistol, the brothers searched his clothing and found $300.00 to $400.00 in cash in a wallet in the bib of the victim's overalls; the two split the money after leaving the murder scene and burned the wallet; and three days after the shooting, defendant made a payment with a hundred dollar bill on a debt for which he was in arrears. Even if the intent to rob or steal the wallet was formed after the shooting, the theft and shooting were part of a single transaction.

**Am Jur 2d, Homicide §§ 27-29, 34-36, 46, 425.**

5. **Larceny § 4.2 (NCI3d) — pistol belonging to husband — allegation of ownership in wife — no fatal variance**
    There was no fatal variance between a larceny indictment alleging that a stolen pistol was the property of the wife and evidence that the pistol belonged to the husband where the evidence showed that the husband and wife had joint possession of the pistol, which was kept in the couple's bedroom, thereby giving the wife a sufficient special property interest

STATE v. ADAMS

[331 N.C. 317 (1992)]

in the pistol to support the allegation of ownership contained in the indictment.

Am Jur 2d, Larceny § 167.

6. **Larceny § 1 (NCI3d)— larceny of firearm—felonious larceny of property including firearm—separate convictions improper**

Where the evidence showed that defendant and his brother stole satellite equipment, coins, and a .38 caliber pistol during a single breaking or entering of a residence, defendant was improperly convicted and sentenced for both larceny of a firearm and felonious larceny pursuant to a breaking and entering of property that included the firearm. Therefore, defendant's conviction for felonious larceny pursuant to a breaking or entering is reversed and the sentence for that offense is vacated.

Am Jur 2d, Larceny §§ 3, 4.

7. **Larceny § 1 (NCI3d); Receiving Stolen Goods § 1 (NCI3d)— larceny and possession of same goods—only one conviction**

While a defendant may be indicted and tried on charges of larceny and possession of the same property, the defendant may be convicted of only one of the offenses. Therefore, where defendant was convicted of both larceny of a firearm and felonious possession of the same firearm, his conviction for possession must be reversed and his sentence for that offense vacated.

Am Jur 2d, Indictments and Informations §§ 221, 223; Larceny § 55; Receiving Stolen Property §§ 14-16.

8. **Larceny § 1 (NCI3d); Receiving Stolen Goods § 1 (NCI3d)— possession of property stolen by breaking or entering—larceny of firearm—possession sentence vacated**

Although defendant's conviction for felonious larceny pursuant to a breaking or entering was reversed, defendant's conviction for felonious possession of property stolen pursuant to the breaking or entering is also reversed where scrutiny of the jury instructions reveals that there is a reasonable likelihood that the jurors could have believed that the "other personal property" possessed by defendant pursuant to the larceny included a pistol which was the basis for defendant's conviction for larceny of a firearm.

Am Jur 2d, Larceny §§ 55, 124, 174.

**9. Homicide § 727 (NCI4th) — felony murder — arrest of judgment on underlying felony**

Where defendant was convicted of first degree murder on the theory of felony murder, judgment entered on the underlying felony of armed robbery must be arrested.

**Am Jur 2d, Homicide §§ 72, 218.**

APPEAL as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a life sentence upon defendant's conviction of first-degree murder entered by *Currin, J.*, at the 7 May 1990 Special Criminal Session of Superior Court, ANSON County. Defendant's motion to bypass the Court of Appeals, pursuant to N.C.G.S. § 7A-31, as to additional convictions and sentences was allowed by this Court on 29 October 1991. Heard in the Supreme Court 13 March 1992.

*Lacy H. Thornburg, Attorney General, by Barry S. McNeill, Special Deputy Attorney General, for the State.*

*J. Kirk Osborn for defendant-appellant.*

MEYER, Justice.

On 20 March 1989, at approximately 4:00 p.m., the residence of George and Lina Hildreth was illegally entered, and television satellite equipment, a .38-caliber pistol, and several Eisenhower silver dollars and Indian head pennies were taken. Ms. Hildreth, who had left her home at 3:40 p.m. to run an errand, returned home to discover the glass window of her kitchen door broken and the house ransacked. Upon discovering the intrusion, she notified the police and awaited their arrival.

Later that afternoon, at approximately 5:00 p.m., the wife of Lee Wallace Parker discovered Mr. Parker lying on the ground of his yard with gunshot wounds to the chest. Ms. Parker discovered that her husband also had been robbed of his wallet and a distinctive pocketknife he customarily carried. Near the body, the police discovered a Newport cigarette butt, a case for a pair of glasses, and a button.

An autopsy revealed that the victim had been shot four times: twice in the chest, once in the right leg, and once in the right hand. Forensics results indicated that the bullets recovered from

STATE v. ADAMS

[331 N.C. 317 (1992)]

the murder scene were fired from the .38-caliber pistol stolen from the Hildreth residence. There was no evidence of gunpowder or residue in or around any of the wounds, and analyses of the victim's clothing produced similar results. No fingerprints were discovered on the murder weapon, which was ultimately recovered by the police. Two prints were identifiable on one piece of the satellite equipment and were determined to belong to defendant.

On the evening of 22 March 1989, Richard Adams was arrested for the breaking and entering of the Hildreth residence. He subsequently provided a written statement regarding the events of 20 March 1989. In the early morning hours of 23 March, the police located defendant, who consented to a search of his home. An officer searching the vanity drawer in defendant's bedroom found a blue sock containing silver dollars. Defendant immediately grabbed the sock and placed it in a closet behind some clothes. In yet another blue sock in the same vanity, police discovered bullet cartridges. Defendant seized this sock as well and placed it in the same location as the first sock. Both socks were later seized by the police and revealed, respectively, five Eisenhower silver dollars and four .38-caliber bullets. The officers also seized a wad of five two-dollar bills, a pack of Newport cigarettes, and some Newport cigarette butts found in an ashtray. Defendant denied any knowledge of the stolen satellite equipment or pistol and denied any involvement in the shooting of the victim. Police later arrested defendant and a search was conducted, which revealed a small pocketknife identified at trial as belonging to the victim. Defendant later directed police to a small pond where the murder weapon was discovered.

At trial, Richard Adams, defendant's older brother, testified for the State. He testified that in February and March of 1989, he and his girlfriend lived in Raleigh with their three small children. On 2 March 1989, the group traveled to Wadesboro and stayed at the home of the sister of defendant and Richard, Sara Garris. Defendant lived within walking distance of the Garris residence. Within a week, Richard ran out of money, and his girlfriend wanted to return to Raleigh. On 20 March 1989 at approximately 1:00 p.m., Richard Adams borrowed a car from Ms. Garris, and the Adams brothers drove toward Albemarle to look for work. While en route, they stopped at a store in Cedar Hill owned by Doris Galliher and saw Ms. Galliher and Gertrude Threadgill. They then proceeded to the Hildreth residence and knocked on the door to determine if anyone was at home. Finding no one at home, Richard

gave defendant a small rock, and defendant cracked the window in the door leading from the carport into the house. When inside, they discovered and removed from the premises a sterling silver pistol with a wooden handle, with five of the six chambers loaded; some television satellite equipment; and some silver dollars. The two were interrupted by the entry of a car in the carport and fled.

After leaving the Hildreth residence, the two returned to their car and drove toward Burnsville, with Richard Adams driving. Defendant asked Richard to stop so that defendant could fire the pistol. Richard complied and defendant shot the pistol one time. The two once again proceeded until they came to another house. Richard recalled at trial that he had been to the house some twelve years before to help the resident, the murder victim, Lee Wallace Parker, with some pigs. The Adams brothers exited the car, and Richard spoke to the victim and asked him for a job. The victim responded that he had no work. Richard then turned to go back to the car, and the victim also walked in that direction. Defendant then shot the victim four times with the pistol stolen from the Hildreth residence. Defendant and his brother then approached the victim, who was lying on the ground, and removed a wallet from the bib part of the victim's overalls.

Richard testified that he and his brother then left the murder scene and drove to defendant's residence in Wadesboro. While there, they removed the satellite equipment and placed it in defendant's home and split the $300.00 to $400.00 that was in the victim's wallet. They then tore up the wallet and burned it. Richard Adams retained possession of the pistol, and defendant kept the satellite equipment. Richard spent the night at the home of a friend, William Kadore Rivers. The next day, defendant brought the satellite equipment to the home of Sara Garris; after showing the equipment to Richard, defendant placed the items in a closet and left. On 22 March, defendant asked Richard for the pistol, and Richard gave it to him.

Richard Adams testified on cross-examination that his earlier written statement indicating that defendant shot the victim while the victim was on the ground was untrue, and insisted that the defendant shot the victim four times before the victim hit the ground. He also indicated that the cigarette butt at the scene belonged to defendant because he was the only one smoking at the time.

Annie McCollum, girlfriend of Richard Adams, testified for the State that on 20 March defendant and Richard Adams left together in Sara Garris' car. She also testified that on the morning of 21 March 1989, defendant brought the stolen satellite equipment to Sara Garris' home. Defendant showed the equipment to Sara Garris and Ms. McCollum and stated that it belonged to him. Defendant also said that "he was looking for Richard because he wanted his gun back." On cross-examination, Ms. McCollum related that she and Richard Adams on a previous occasion had fought over the lack of money for items for the children.

Doris Galliher, who operates a grocery store in the Cedar Hill community near Ansonville, testified that on 20 March 1989, at some time between 3:30 and 4:00 p.m., she saw the Adams brothers in her store. She also testified that she saw the two drive away in a car "just like" that belonging to Sara Garris, which the Adams brothers allegedly borrowed on the day of the murder. Upon exiting the store, the brothers drove in the direction of the Hildreth residence.

Gertrude Threadgill also testified that Richard and another black man, similar in size to Richard, were in the store owned by Ms. Galliher on 20 March 1989. She related that she saw the two drive away in a blue car heading toward the Hildreth residence.

Henry Lee, who was employed as a bill collector by the Heilig-Meyers Furniture Company, testified that approximately a week before the murder, he visited defendant at his home and inquired about late payments on a television and videocassette recorder that defendant had purchased. At the time, defendant promised that he would make payments within a week. On 23 March, Mr. Lee once again visited defendant and sought payment. At this time, defendant made a payment to Mr. Lee of a hundred-dollar bill, and stated that he would make another payment by the end of the month.

William Kadore Rivers testified that at about 1:00 a.m. on 21 March, he was awakened by Richard Adams, whom he had known since 1982. Once inside Rivers' home, Richard Adams talked about one or two robberies that he and his brother had carried out the night or afternoon before. Richard showed Rivers a wallet containing "some bills, maybe a couple hundred dollars, twenties, fives, maybe a ten or so, and he also flashed a gun." Richard also showed Rivers some coins that Rivers believed might have

been Eisenhower silver dollars. Richard told Rivers that he and defendant had gone to Burnsville and that defendant had shot an old man "[t]wo or three" times while the old man was on the ground. Richard described having his knee across the victim's chest and neck area while the defendant shot the victim. Later, Richard asked Rivers if he had any .38-caliber bullets for the pistol, and Rivers provided Richard with approximately ten bullets. On cross-examination, Rivers stated that Richard visited his home at about 1:30 p.m. on 19 March 1989 and told Richard that he needed to make a "lick" (commit a robbery) in order to buy diapers for the children. Richard also told Rivers that he and defendant had broken in and "wrecked" a coin machine at Anson County High School, but Richard did not indicate when this crime had occurred.

Defendant testified on his own behalf and denied any involvement in the breaking and entering of the Hildreth residence and the killing and robbery of the victim. He denied traveling anywhere with Richard Adams on the day of the murder. He further testified that the pocketknife was his and that he won the silver dollars and two-dollar bills in a gambling game with Richard. He admitted touching the satellite equipment at a time when Richard Adams attempted to sell it at a local gambling house. Defendant also testified that the .38-caliber bullets found in his home had been stolen from a house he had broken into "a long time ago." Finally, defendant testified that he was able to lead police to the location of the gun because Richard had shown him the gun on 21 March. He testified that Richard had gone to a lake and returned without the gun, whereupon Richard commented that the "gun was gone." Defendant also offered several witnesses to establish an alibi defense.

The case was tried capitally. The jury convicted defendant of first-degree felony murder, robbery with a dangerous weapon, felonious breaking or entering, felonious larceny, felonious larceny of a firearm, felonious possession of property stolen pursuant to a breaking or entering, and felonious possession of a stolen firearm. Upon the jury's deadlock as to sentencing pursuant to N.C.G.S. § 15A-2000, the court imposed a life sentence for the felony murder conviction. The court also imposed on defendant the following sentences: a ten-year sentence for the felonious breaking or entering conviction to run consecutive to the life sentence, a ten-year sentence for felonious larceny to run consecutive to the breaking or entering sentence, and a ten-year sentence for the felonious

larceny of a firearm conviction to run consecutive to the felonious larceny sentence. Finally,. the court imposed a forty-year sentence for the robbery with a dangerous weapon conviction to be merged with the life sentence defendant received and ten-year sentences for both defendant's convictions for felonious possession of property stolen pursuant to a breaking or entering and felonious possession of a stolen firearm, which were merged with defendant's sentences for felonious larceny and felonious larceny of a firearm.

Defendant makes several assignments of error. We will address each in turn.

[1]   Defendant first argues that the trial court erred in admitting the testimony of William Kadore Rivers regarding statements made to him by Richard Adams concerning the shooting of the victim. The trial transcript reveals that Rivers related the following on direct examination by the State:

Q. What else did Richard say about this lick?

A. Well, when he first—when he first came in, I don't know, he was like he was a little hyped. He was talking about the lick, and he flashed a wallet on me.

MR. JONES: I couldn't understand that.

THE WITNESS: He flashed a wallet.

A. (Continuing) The wallet contained some bills, maybe a couple hundred dollars, twenties, fives, maybe a ten or so, and he also flashed a gun. He was talking about him and his brother went to Burnsville, and in Burnsville—somewhere doing this lick in Burnsville. He had ran [sic] up on an old man that he said that they put the bum rush on.

Q. They did what?

A. Subdued him, in other words. And as he subdued [sic], and he said his brother shot him.

Q. Did he say how many times his brother shot the old man?

A. Two or three. I'm not sure. I'm pretty sure he said two or three.

. . . .

Q. Did Richard describe how his brother Catfish killed the old man?

A. The only thing he said—he made a statement like he subdued him. Richard said, well, he had his knee kind of like across the man's chest and neck area and his brother shot him.

Q. And his what?

A. His brother shot him.

Q. Did he say how many times his brother shot him in that position?

A. He said two or three times.

Q. Did he tell you how far [his brother] was from the old man when he shot him?

A. From the way he was talking, he was right up on him.

Q. Did he say whether or not the old man was on the ground when he—

A. He said he was on the ground.

Q. —when he shot him?

A. Yes.

Q. When his brother shot him?

A. Yes.

The record indicates that, near its very outset, defense counsel objected to the Rivers testimony on the basis of hearsay and requested an instruction to this effect. The court instructed the jury as follows:

> THE COURT: Members of the jury, you must consider this testimony solely for the purpose that it—as you may find it to corroborate the prior testimony of Richard Adams. You may not consider it as substantive evidence of the matter stated.

Also, at the close of all the evidence, defense counsel moved for a mistrial or, alternatively, that the court strike Rivers' testimony, give a corrective instruction to the jury, and prohibit the State from arguing that Richard's alleged statement to Rivers could be considered as evidence of defendant's guilt. The trial court denied these requests.

STATE v. ADAMS

[331 N.C. 317 (1992)]

Defendant first argues that the court committed prejudicial error in admitting Rivers' testimony insofar as it is impermissible to admit prior inconsistent statements under the guise of corroboration. *State v. Burton*, 322 N.C. 447, 368 S.E.2d 630 (1988); *State v. Ramey*, 318 N.C. 457, 349 S.E.2d 566 (1986); *State v. Murphy*, 100 N.C. App. 33, 394 S.E.2d 300 (1990). Defendant asserts that the testimony was inconsistent in several respects and was therefore not admissible. Richard Adams testified at trial that defendant shot the victim four times as Richard Adams was walking back to the car and that both of the Adams brothers then searched the victim's clothing and retrieved the wallet. On cross-examination, Richard Adams admitted that his written statement indicating that defendant shot the victim while the victim was lying on the ground was untrue. Rivers, on the other hand, testified that Richard informed him that defendant shot the victim two or three times while Richard subdued the victim on the ground. Moreover, although Richard Adams admitted visiting Rivers on 20 and 21 March 1989, he denied showing Rivers the pistol stolen from the Hildreth residence. Rivers stated on direct examination that Richard Adams showed him the gun and allowed Rivers to hold it.

These variations, defendant argues, amounted to the improper admission of new evidence, entered under the guise of corroboration. *State v. Hunt*, 324 N.C. 343, 378 S.E.2d 754 (1989). According to defendant, *Ramey, Burton*, and *Murphy* permit the introduction of "new facts" only if such facts further explain or embellish previously admitted substantive evidence. The Rivers testimony, defendant contends, amounted to an entirely new depiction of the facts, one that characterized defendant as the triggerman, a characterization at variance with defendant's theory that Richard Adams acted alone in the killing.

The State argues that defendant waived any objection in this regard. While defendant made a general objection and successfully sought an instruction at the outset, defendant failed to make specific objections during Rivers' testimony and on cross-examination of Rivers pursued the line of inquiry pertaining to the circumstances surrounding how the victim was shot. Defendant even had Rivers demonstrate for the jury how he understood Richard to have his knees across the victim's chest and neck area.

We conclude that no prejudicial error occurred in this regard. Scrutiny of the trial transcript reveals that defense counsel cross-

STATE v. ADAMS

[331 N.C. 317 (1992)]

examined Rivers about Rivers' assertion that Richard had told him that defendant had shot the victim while Richard subdued the victim on the ground. Moreover, defense counsel elicited the help of Rivers in demonstrating how Richard allegedly held the victim on the ground while defendant shot the victim. It is well settled that an adverse party may explain evidence or may contradict its probative value on cross-examination and not thereby waive an initial objection. *State v. Godwin*, 224 N.C. 846, 847-48, 32 S.E.2d 609, 610 (1945). However, it is equally well settled that waiver does occur in the event that the "cross-examiner's questions [are] general ones, propounded for the sole purpose of amplifying the information [the witness has] given on direct examination and not for the purpose of impeaching his testimony or establishing its incompetency." *State v. Van Landingham*, 283 N.C. 589, 604, 197 S.E.2d 539, 549 (1973). Here, it is manifest that defense counsel sought not to impeach the Rivers testimony, but rather to amplify the account rendered by Rivers. As in *Van Landingham*, we conclude that the admission of Rivers' testimony was error, but the error was cured when testimony of like import was thereafter amplified on cross-examination by defense counsel.[1]

[3] As to the admission of Rivers' statement that Richard Adams showed Rivers the alleged murder weapon, we conclude that the court did not err. Assuming *arguendo* that the Rivers testimony as to the gun was hearsay, we conclude that this evidence was properly admitted for corroborative purposes. While Richard contended on direct examination that he did not show the gun to Rivers, he conceded on cross-examination that Rivers in fact saw the weapon. Further, on direct examination by the State, Richard admitted asking Rivers for some bullets for the gun.

Corroborative testimony is testimony which tends to strengthen, confirm, or make more certain the testimony of

---

[2] 1. The State also argues that because the jury deadlocked as to whether the death penalty was proper, the instant case was transformed into a noncapital case. Citing *State v. Harrison*, 328 N.C. 678, 682, 403 S.E.2d 301, 304 (1991), the State contends that because the case became noncapital in nature, defendant could not rely upon a general objection made only once at the outset of the testimony, but was required to object to the incompetent portions of Rivers' testimony. Although unnecessary to the disposition of this issue, we feel compelled to express our disagreement with the State's contention. The instant case was prosecuted capitally and did not lose its capital nature at sentencing with the jury's deadlock, well after the arguably erroneous testimony was admitted. Thus, it was not incumbent upon defendant to object to each allegedly objectionable portion of the extensive direct examination of Rivers.

STATE v. ADAMS

[331 N.C. 317 (1992)]

> another witness. Where testimony which is offered to cor-
> roborate the testimony of another witness does so substantial-
> ly, it is not rendered incompetent by the fact that there is
> some variation. It is the responsibility of the jury to decide
> if the proffered testimony does, in fact, corroborate the
> testimony of another witness.

*State v. Rogers*, 299 N.C. 597, 601, 264 S.E.2d 89, 92 (1980) (citations
omitted). In *Rogers*, we determined that there is a "threshold test
of substantial similarity." *Id.* at 601, 264 S.E.2d at 92. We conclude
that there was "substantial similarity" between the testimony of
Rivers and Richard Adams as it related to the gun, given that
Richard Adams admitted on cross-examination that Rivers had in
fact observed the gun. We therefore overrule this assignment of
error.

[4] In his next assignment of error, defendant argues that the
trial court erred in submitting the felony murder theory to the
jury and in not dismissing the robbery with a dangerous weapon
charge. Defendant contends that no evidence was adduced tending
to show that defendant discussed the theft of the victim's wallet
with Richard Adams or that defendant was aware that Richard
intended to take the wallet from the victim. Only as an after-
thought, knowing that the victim carried money on his person,
did Richard Adams rob the victim. Defendant argues that because
the intent to steal did not coincide with the use of violence to
perpetrate the robbery, the common law definition of robbery is
not satisfied. Citing *State v. Pakulski*, 319 N.C. 562, 356 S.E.2d
319 (1987), defendant contends that where a robbery is committed
as an afterthought once the victim has died, the evidence is insuffi-
cient to convict on the basis of robbery with a dangerous weapon.
According to defendant, the evidence presented here will at best
support a conviction of larceny. Therefore, defendant argues, he
is entitled to a reversal of his conviction of first-degree murder
under the felony murder rule because the State is required to
show an interrelationship between the felony and the homicide.
*State v. Strickland*, 307 N.C. 274, 291-94, 298 S.E.2d 645, 657-58
(1983), *overruled on other grounds by State v. Johnson*, 317 N.C.
193, 344 S.E.2d 775 (1986).

The rules governing motions to dismiss are well settled. When
a defendant moves for dismissal, the trial judge must determine
whether there is "substantial evidence of each essential element

of the offense charged and of the defendant being the perpetrator of the offense." *State v. Vause*, 328 N.C. 231, 236, 400 S.E.2d 57, 61 (1991). If the evidence, viewed in a light most favorable to the State, permits a reasonable inference that the defendant is guilty of the crime charged, the trial judge should allow the case to go to the jury. *Id.* at 237, 400 S.E.2d at 61. This is the case whether the evidence is direct, circumstantial, or both. *Id.*

In *State v. Small*, we stated as follows:

[R]obbery [with a dangerous weapon] under N.C.G.S. § 14-87 consists of the following elements:

(1) the unlawful taking or an attempt to take personal property from the person or in the presence of another (2) by use or threatened use of a firearm or other dangerous weapon (3) whereby the life of a person is endangered or threatened.

*State v. Beaty*, 306 N.C. 491, 496, 293 S.E.2d 760, 764 (1982) (in part quoting *State v. Mull*, 224 N.C. 574, 576, 315 S.E.2d 764, 765 (1944)).

*Small*, 328 N.C. 175, 181, 400 S.E.2d 413, 416 (1991) (citation omitted). We conclude that there was ample evidence from which a jury could reasonably infer the satisfaction of each of the statutory elements enunciated above. The record shows that defendant and his brother Richard were in need of quick money. Richard needed money to purchase necessities for the children, and defendant was being pressed to make payments on a television and a videocassette recorder. At the time that defendant and Richard drove to the victim's residence, they had already broken into the Hildreth residence, where they stole a pistol, television satellite equipment, and some coins. The thefts from the Hildreth residence were interrupted when Ms. Hildreth returned home unexpectedly. According to Richard Adams, the brothers were looking for anything of value.

After stopping the car once to fire the stolen pistol, they next arrived at the home of the victim, for whom Richard had worked in the past. Trial testimony indicated that the victim "nearly always" carried one or more hundred-dollar bills on his person, as well as two-dollar bills that he collected. The record reveals that Richard Adams was aware that the elderly victim carried money on his person. This belief proved well founded, for after shooting the victim the brothers searched his clothing, finding $300.00

to $400.00 in cash in a wallet located in the bib of the victim's overalls. The two split the money after leaving the murder scene and burned the wallet. Only three days after the shooting, defendant made a payment with a hundred-dollar bill on a debt in which he was in arrears. Given this evidence, the jury reasonably could have inferred that the Adams brothers acted in concert to rob the victim.

Even if the intent to rob or steal the wallet was formed after the shooting, the theft and shooting were part of a single transaction. As we noted recently in *State v. Faison*, "it is immaterial whether the intent was formed before or after force was used upon the victim, provided that the theft and force are aspects of a single transaction." *State v. Faison*, 330 N.C. 347, 359, 411 S.E.2d 143, 150 (1991). Therefore, we conclude that the evidence was sufficient for the jury to find defendant guilty of acting in concert in the felony murder of the victim, and the trial court properly denied defendant's motion to dismiss.

[5] Defendant next argues that the trial court erred in denying his motion to dismiss the charge of felonious larceny. The indictment in question alleges that the stolen .38-caliber pistol was the property of Lina Hildreth; however, both Ms. Lina Hildreth and Mr. George Hildreth testified that the pistol belonged to Mr. Hildreth. This variance, defendant argues, is fatal and required dismissal of the charge. *See State v. Watson*, 272 N.C. 526, 158 S.E.2d 334 (1968). The State contends, and we agree, that no such fatal variance exists. Although the Hildreths alluded to the pistol as belonging to George, such references did not preclude Lina's ownership or possessory interest in the pistol. In *State v. Greene*, 289 N.C. 578, 584, 223 S.E.2d 365, 369 (1976), we stated that "the general law has been that the indictment in a larceny case must allege a person who has a property interest in the property stolen and that the State must prove that the person has ownership, meaning title to the property or some special property interest." Here, the evidence showed that the Hildreths had joint possession of the pistol, which was kept in a chest of drawers in the couple's bedroom, thereby giving Lina Hildreth a sufficient *special* property interest in the pistol to support the allegation of ownership contained in the indictment. *State v. Hauser*, 183 N.C. 769, 111 S.E. 349 (1922) (spouses have special interests in one another's property); *see also State v. Young*, 60 N.C. App. 705, 299 S.E.2d 834 (1983). We therefore overrule this assignment of error.

[6]  In his next assignment of error, defendant argues that the trial court erred in imposing consecutive sentences for defendant's convictions of felonious larceny of a firearm and felonious larceny of property stolen pursuant to a breaking or entering. Defendant argues that the indictment in case number 89-CRS-1139 alleges that he stole "one video sub carrier, one antenna and other personal property," and the evidence at trial tended to show that such "other personal property" included the .38-caliber pistol that was the subject of the indictment in case number 89-CRS-1140. Citing *State v. Boykin*, 78 N.C. App. 572, 337 S.E.2d 678 (1985), defendant argues that when a defendant has been convicted of larceny of property that includes a firearm that is also the subject of a felonious larceny of a firearm conviction, the trial court may not impose sentences for both crimes.

The State contends that no error occurred because the trial court instructed the jury that the charge of felonious larceny of a firearm in case number 89-CRS-1140 was separate and distinct from the charge of felonious larceny in case number 89-CRS-1139. According to the State, the charges were in fact separate, and defendant was not subjected to multiple punishments for the same offense as a result of being convicted and sentenced on both charges. Further, the State argues that *Boykin* is distinguishable from the case at bar and hence does not control this issue.

We agree with defendant that the holding in *Boykin* controls here and further conclude that the decision of the Court of Appeals in that case was correct. In *Boykin*, the defendant was indicted on three separate counts of felonious larceny of a firearm and one count of felonious larceny of goods in excess of $400.00. The Court of Appeals held that the trial court erred in failing to dismiss the three larceny of firearms charges because the defendant could only be charged with one count of felonious larceny. In a case of first impression, the Court of Appeals held that

> the purpose of G.S. 14-72 is to establish levels of punishment for larceny based on the value of the goods stolen, the nature of the goods stolen or the method by which stolen, not to create new offenses. Nothing in the statutory language suggests that to charge a person with a separate offense for each firearm stolen in a single criminal incident was intended.

*Boykin*, 78 N.C. App. at 576, 337 S.E.2d at 681. Here, defendant was charged with one count of felonious larceny of a firearm, under

N.C.G.S. § 14-72(b)(4), and one count of felonious larceny of property stolen pursuant to breaking or entering, under N.C.G.S. §§ 14-72(b)(2) and 14-54. As noted by then-Judge (now Justice) Whichard, "[a] single larceny offense is committed when, as part of one continuous act or transaction, a perpetrator steals several items at the same time and place." *State v. Froneberger*, 81 N.C. App. 398, 401, 344 S.E.2d 344, 347 (1986); *see also State v. Martin*, 82 N.C. 672, 674 (1880). In the case at bar, the Adams brothers stole the satellite equipment, various coins, and the .38-caliber pistol during the course of a single breaking or entering of the Hildreth residence. Hence, defendant was improperly convicted and sentenced for both larceny of a firearm and felonious larceny of that same firearm pursuant to a breaking or entering. Therefore, we reverse defendant's conviction of and vacate defendant's sentence on the felonious larceny pursuant to a breaking or entering charge.

Finally, defendant argues that the trial court erred by entering judgments on his convictions for felonious possession of stolen property in case numbers 89-CRS-1139 and 89-CRS-1140, as well as entering a judgment for his underlying conviction of robbery with a dangerous weapon in case number 89-CRS-1138. As to the former, defendant argues that he cannot be sentenced for both larceny and possession of the same property. *State v. Perry*, 305 N.C. 225, 287 S.E.2d 810 (1982). Here, the trial court entered judgments imposing ten-year sentences for larceny in both 89-CRS-1139 and 89-CRS-1140. According to defendant, the trial court therefore improperly entered judgments for felonious possession of the same property. As to the robbery with a dangerous weapon judgment, defendant argues that he cannot be sentenced for both felony murder and the underlying felony, and therefore the underlying felony must be arrested. *State v. Woods*, 286 N.C. 612, 213 S.E.2d 214 (1975); *State v. Moore*, 284 N.C. 485, 202 S.E.2d 169 (1974).

[7-9] We conclude that the judgments were improperly entered. The court's action violated the rule stated in *Perry*, namely, that while a defendant may be indicted and tried on charges of larceny and possession of the same property, the defendant may be convicted of only one of the offenses. *Perry*, 305 N.C. at 236-37, 287 S.E.2d at 815-16. Therefore, defendant's conviction for felonious possession of a stolen firearm is reversed and his sentence thereon vacated. Defendant's conviction and sentence for felonious possession of property stolen pursuant to a breaking or entering poses a somewhat different legal question. As discussed above, we reverse

defendant's conviction for felonious larceny pursuant to a breaking or entering and vacate his sentence; as a result, the concurrent sentence defendant received for felonious possession of property stolen pursuant to a breaking or entering is potentially activated. However, scrutiny of the jury instructions reveals that there is a reasonable likelihood that the jurors could have believed that the "other personal property" possessed by defendant pursuant to the larceny included the .38-caliber pistol stolen from the Hildreth residence. Therefore, defendant's conviction for felonious possession of property stolen pursuant to a breaking or entering is reversed and his sentence thereon vacated. Finally, as to the judgment regarding robbery with a dangerous weapon in case number 89-CRS-1138, we also conclude that judgment was improperly entered. The record shows that the jury returned its guilty verdict as to first-degree murder on the basis of defendant's involvement in the commission of felony murder, namely, the robbery and murder of the victim. Thus, judgment should have been arrested as to the robbery charge. *State v. Woods*, 286 N.C. 612, 213 S.E.2d 214.

In conclusion, we find no error in defendant's convictions and sentences for first-degree murder, felonious larceny of a firearm, and felonious breaking or entering. We reverse defendant's convictions and vacate defendant's sentences for felonious larceny pursuant to a breaking or entering and felonious possession of a stolen firearm, reverse defendant's conviction and vacate defendant's sentence for felonious possession of property stolen pursuant to a breaking or entering, and arrest the judgment entered against defendant regarding robbery with a dangerous weapon.

No. 89-CRS-1115, first-degree murder: no error.

No. 89-CRS-1138, robbery with a dangerous weapon: judgment arrested.

No. 89-CRS-1139, count 1, felonious breaking or entering: no error.

No. 89-CRS-1139, count 2, felonious larceny: judgment of conviction reversed and sentence vacated.

BRANNON v. N.C. STATE BOARD OF ELECTIONS

[331 N.C. 335 (1992)]

No. 89-CRS-1139, count 3, felonious possession of property stolen pursuant to a breaking or entering: judgment of conviction reversed and sentence vacated.

No. 89-CRS-1140, count 1, felonious larceny of a firearm: no error.

No. 89-CRS-1140, count 2, felonious possession of stolen firearm: judgment of conviction reversed and sentence vacated.