STATE OF NORTH CAROLINA v. EDWARD OTIS DEMERY

No. 9322SC262

(Filed 21 December 1993)

**1. Homicide § 284 (NCI4th)— second-degree murder—evidence sufficient**

The evidence was sufficient to deny defendant's motions for dismissal in a prosecution for second-degree murder.

**Am Jur 2d, Homicide § 425 et seq.**

**2. Evidence and Witnesses § 2210 (NCI4th)— murder— bloodstains—blood group profiles**

An SBI agent who testified in a murder prosecution as to blood-grouping tests done on bloodstains at the scene and on defendant's blood was testifying within his expertise and established a sufficient foundation for the purpose of calculating the incidence of defendant's and victim's blood factors in the population at large.

**Am Jur 2d, Expert and Opinion Evidence § 300.**

**3. Evidence and Witnesses § 2172 (NCI4th)— second-degree murder—blood-grouping tests—statistical information—not hearsay**

An SBI agent's testimony about blood-grouping tests did not violate the hearsay rule in a murder prosecution where the agent relied on statistical information concerning the frequency of blood group factors or characteristics in the North Carolina population which had been compiled by the SBI with blood provided by the Red Cross and blood obtained in criminal cases. The statistics on which the agent relied are commonly used and accepted in this field in North Carolina and similar statistics are commonly used and accepted in forensic serology throughout the country.

**Am Jur 2d, Expert and Opinion Evidence § 32 et seq.**

**4. Constitutional Law § 349 (NCI4th)— murder—bloodstains— blood-grouping testimony—no violation of right to confront adverse witnesses**

A murder defendant's Sixth Amendment right to confront adverse witnesses was not violated by the testimony of an

STATE v. DEMERY

[113 N.C. App. 58 (1993)]

SBI agent regarding blood grouping tests where the only part of the testimony not based on the agent's personal knowledge was the statistical database, which was admissible under N.C.G.S. § 8C-1, Rule 703.

**Am Jur 2d, Criminal Law §§ 720 et seq., 956 et seq.**

5. **Evidence and Witnesses §§ 2847, 3081 (NCI4th)— murder— statements of witnesses to police—written versions unexamined by witnesses—recollection refreshed—impeachment**

The trial court did not err in a murder prosecution by allowing the State to use typewritten versions of oral statements given by two witnesses to officers where the witnesses had not reviewed the statements before trial. The statements were not used as substantive evidence, but to refresh the witnesses' recollections or to impeach portions of courtroom testimony inconsistent with the statements. A statement used to refresh a witness's recollection need not be signed by him or even be his own prior statement and the witness who was impeached acknowledged the prior statement at trial. Moreover, defendant waived objections to these statements by using them on cross-examination or by failing to object to their use.

**Am Jur 2d, Witnesses §§ 456, 600 et seq.**

6. **Evidence and Witnesses § 668 (NCI4th)— murder—witnesses' statements—no plain error**

There was no plain error in a murder prosecution from the use of testimony from an SBI agent regarding statements by witnesses where defendant either did not object to the agent's testimony or did not make a sufficiently specific objection to preserve defendant's right of appeal, so that the agent's testimony is reviewable only for plain error, and there was substantial evidence against defendant which in no way depended upon the statements or the agent's testimony as to the contents of those statements.

**Am Jur 2d, Appeal and Error § 548.**

Appeal by defendant from second degree murder conviction entered 9 September 1992 by Judge James M. Long in Davidson County Superior Court. Heard in the Court of Appeals 17 November 1993.

STATE v. DEMERY

[113 N.C. App. 58 (1993)]

*Attorney General Michael F. Easley, by Special Deputy Attorney General Norma S. Harrell, for the State.*

*Appellate Defender Malcolm Ray Hunter, Jr., by Assistant Appellate Defender Susan G. White, for defendant-appellant.*

WYNN, Judge.

Wayne Koonts lived in the Pines Mobile Home Park outside Lexington, North Carolina. He owned and rented several trailers in the park. Defendant rented a trailer from Koonts for $70 weekly. In March 1987 defendant was behind in his rent. Koonts had tried to evict him several months earlier. (The case was dismissed when Koonts was late to court.) Defendant had promised to pay up the back rent two weeks at a time until he was caught up, but he had not done so. On Friday, 6 March 1987, defendant came to Koonts's trailer to use the telephone, and Koonts asked him about the rent. Defendant said he did not have it, but would try to have it during the weekend. Koonts asked defendant to give him what he had then, and defendant gave Koonts $100.00. Koonts said he would give defendant a receipt when defendant paid him the rest of the money.

On Sunday evening, 8 March 1987, defendant was at his trailer with Thadis Brooks and Ernie Wayne Jacobs. Brooks and defendant were distantly related by blood, and Brooks had known defendant all his life. Jacobs was defendant's nephew. He lived part of the time with defendant and part of the time with Brooks. On this evening, Koonts came to defendant's trailer and asked for the rent. Brooks testified that Koonts appeared friendly, but Jacobs testified that Koonts seemed to get angry or upset during the conversation. Jacobs testified that he gave defendant $20 to give to Koonts. Defendant gave the money to Koonts and said they would get "squared away" with the remaining amount. After Koonts left, defendant said that he had paid Koonts all the money he had and that he was "broke." Jacobs testified that defendant appeared upset after Koonts left the trailer. Brooks described defendant as embarrassed and frustrated that he had to borrow money to pay the rent.

Sometime after Koonts left, defendant, Jacobs, and Brooks went to the trailer of Debbie Presnell. They telephoned defendant's sister in Lumberton. Various witnesses testified that the conversation included statements that defendant and Jacobs were locked

up "for killing an old man," that Brooks needed $600 because they had killed a man, that they had cut a man up, or similar statements. The three were all laughing and joking at the time. Defendant's sister, Sheila Cummings, testified that Brooks called her on 8 March 1987; that he said defendant was in jail in South Carolina for rape, asking for $300; that defendant then got on the telephone and told her not to pay any attention to it; and that Brooks and defendant were laughing and teasing her.

Jacobs testified that defendant, Brooks, and he went back to defendant's trailer, and he and Brooks were picked up by Patricia Demery. Jacobs also testified that just before they drove away, defendant said, "I'm going to get him," referring to Koonts.

Jacobs and Brooks were gone all night on an out-of-state truck haul.

On the afternoon of Monday, 9 March 1987, Koonts was found dead on the floor of his bedroom. Koonts's wallet was lying on top of his receipt book, which was lying face up and open on his kitchen table, which is where he normally sat to write receipts. The wallet, which usually contained money, contained papers but no money. The receipt book contained a partially complete receipt in Koonts's writing with the number "20" filled in in the place for the trailer number and the word "March" written out, but the rest incomplete. The partially completed receipt followed the last completed receipt, which was dated 7 March 1987. Trailer number 20 was defendant's trailer. There was no receipt in the book for $100 from defendant on 6 March 1987. Koonts generally collected the rent on Fridays. He normally kept rent money in his trailer or in his wallet until he could go to the bank.

Koonts's body had 32 separate wounds. The majority were in the facial area. There were also wounds on the top of his skull, the back of his head, his neck, along his rib cage, on his hands and on his knee. The wounds were caused by a sharp instrument. Although the deceased had gray hair, there was a very dark hair, longer than the deceased's, on the bed. Defendant's hair was black and worn shoulder-length at the time of the killing.

There was blood on the wall behind the victim's head and underneath his body. According to tests performed at the State Bureau of Investigation ("SBI"), there was blood on the victim's bottom sheet, on a pillow case, on six areas of his bedspread and

on a quilt taken from his bed. Defendant's blood was typed for eight different factors, as was the victim's blood. The victim's blood differed from the defendant's in several factors. Of the six areas of bloodstain on the bedspread, two were the same as defendant's blood on all eight factors. Two others were the same as his on all factors the SBI was able to check. One stain was insufficient for analysis. The sixth area was sufficient to analyze on six factors. It differed from defendant's blood in two of the factors, but was consistent with the victim's blood. The blood on the quilt could have been the victim's but not the defendant's. The blood on the bottom sheet was consistent with defendant's blood, but not with the victim's. Neither Jacobs's nor Brooks's blood matched the blood which could not have been the victim's. A forensic serologist testified that defendant's blood profile would be expected to occur in .2% of the population, while the victim's would occur in 8.2% of the population.

On 9 March 1987, a green army fatigue-type jacket and jeans, which is what defendant had been wearing on 8 March, were removed from a washing machine in defendant's trailer; the washer was full of water and contained soap powder. There was apparently nothing else in the washer.

On 9 March 1987, after Brooks and Jacobs returned from their trip, defendant had a scratch on his arm which was not there before they left. Defendant told Brooks that a dog had jumped up on him. When blood and hair samples were taken from defendant on 13 March 1987, defendant had a substantial cut on his thumb which had scabbed over but not healed. Defendant said he had cut himself sharpening a knife.

Patricia Demery found a knife pushed down at the side of the sofa at the home she shared with Brooks approximately a week after Koonts's death. This knife was found to be consistent with Koonts's wounds. Defendant had slept on that couch during the weekend of the murder.

In a conversation several months after his arrest, defendant told Brooks that he had the people at the sheriff's office "fooled." Brooks testified that the statement did not indicate an admission of guilt, only that he was tired of people harassing him.

Defendant presented testimony of an Anthony Fowler that on 9 March 1987, a man named Sherwood McBride told him he

STATE v. DEMERY

[113 N.C. App. 58 (1993)]

had just killed a man. However, analysis of Sherwood McBride's blood revealed that he could not have contributed the blood on the bottom sheet or the four stains on the bedspread which could not have been the victim's.

## I.

[1] Defendant moved for dismissal at the conclusion of the state's evidence and at the conclusion of all the evidence.

On a motion to dismiss, the trial court must determine "whether there is substantial evidence of each essential element of the offense charged and of the defendant being the perpetrator of the offense." *State v. Vause*, 328 N.C. 231, 236, 400 S.E.2d 57, 61 (1991). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Bates*, 313 N.C. 580, 581, 330 S.E.2d 200, 201 (1985). "[T]he evidence is to be considered in the light most favorable to the State; the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom . . . ." *State v. Robbins*, 309 N.C. 771, 775, 309 S.E.2d 188, 190 (1983) (quoting *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980)).

We find that the evidence that was presented tending to show that defendant was the perpetrator was sufficient to justify the trial court's denial of defendant's motion. We need not reiterate this evidence, as it is set forth in the factual section above.

## II.

[2] At trial, SBI Agent David Spittle testified that defendant's blood profile was the same as .2% of the population and the victim's blood profile was the same as 8.2% of the population. Defendant challenges this evidence as being beyond the scope of the witness's expertise, lacking an adequate foundation, violating the hearsay rule, and violating the defendant's right to confront witnesses against him.

First, we find Spittle's testimony to be within his expertise. As a forensic serologist, Agent Spittle had a bachelor's degree in biology with a chemistry minor, a master's degree in biology, and post-graduate work in pharmacology. He had received on-the-job training in forensic serology with the Federal Bureau of Investigation before beginning employment with the SBI in 1979. He had also attended schools and seminars relating to forensic

serology. Although he had never taken a formal statistics course, he was acquainted with the use of statistics in his employment.

Agent Spittle testified as to how population percentages of specific blood group profiles are calculated and that he had received instructions concerning such calculations during the course of his employment. Using statistics about the population provided to him by the SBI, the results of the blood tests he himself performed, and a hand-held calculator, he then calculated the blood type percentages to which he testified.

Our courts have repeatedly upheld similar testimony by SBI forensic serologists. In *State v. Payne*, 328 N.C. 377, 398, 402 S.E.2d 582, 594 (1991), we upheld testimony of an SBI agent who was an expert in the "field of blood analysis" that approximately 1% of the state's population has the same blood profile as the victim. In *State v. Huffstetler*, 312 N.C. 92, 105-06, 322 S.E.2d 110, 119 (1984), *cert. denied*, 471 U.S. 1009, 85 L.Ed.2d 169 (1985), we upheld testimony by an SBI serologist that .6% of the United States population has the same blood characteristics as the victim and as blood found on the defendant's clothing. *See also State v. Ziglar*, 308 N.C. 747, 304 S.E.2d 206 (1983). We hold that Agent Spittle's testimony was within the scope of his expertise.

Defendant next argues that Spittle did not lay a proper foundation for his testimony because he did not establish that his statistical data, which included Lumbee Indians within the Caucasian population, would accurately assess the coincidence factors of a Lumbee Indian such as defendant.

However, there was no need for Spittle to establish such a fact. The State was not trying to prove anything about the incidence of defendant's blood type among Lumbee Indians. Rather, it sought to prove the incidence of defendant's blood type in the population at large. In testifying that the defendant's blood profile was of a type found in .2% of the population and that the victim's blood profile was of a type found in 8.2% of the population, Spittle explained that eight different blood factors were tested for both the defendant and the victim; that the population percentage was reached by using the frequency of each factor in the population and then multiplying those factors together; and that the various factors in the blood are not interdependent but are independently inherited. Spittle thereby established a sufficient foundation for the purpose

of calculating the incidence of defendant's and victim's blood factors in the population at large.

[3] Defendant next argues that Agent Spittle's testimony violated the hearsay rule. He contends that Spittle merely reiterated data compiled by others and that such information was inadmissible hearsay because it does not fall within the hearsay exception provided in Rule 703 of the Rules of Evidence:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

N.C. Gen. Stat. § 8C-1, Rule 703 (1992).

In *State v. Huffstetler*, 312 N.C. at 106, 322 S.E.2d at 120, our Supreme Court adopted and applied the standard for testimony by serologists and other experts previously articulated for physician experts in *State v. Wade*, 296 N.C. 454, 462, 251 S.E.2d 407, 412 (1979):

> (1) A physician, as an expert witness, may give his opinion, including a diagnosis, based either on personal knowledge or observation or on information supplied him by others, including the patient, if such information is inherently reliable even though it is not independently admissible into evidence. The opinion, of course, may be based on information gained in both ways. (2) If his opinion is admissible the expert may testify to the information he relied on in forming it for the purpose of showing the basis of his opinion.

Spittle relied on statistical information concerning the frequency of blood group factors or characteristics in the North Carolina population. This information had been compiled by the SBI, with blood provided by the Red Cross and blood obtained in criminal cases. The statistics on which he relied are commonly used and accepted in his field in North Carolina, and similar statistics are commonly used and accepted in forensic serology throughout the country. In *Payne*, our Supreme Court held that testimony that the serologist's opinion "was based on statistics from SBI studies conducted between 1979 and 1983 and from scientific journals, both of which he testified are generally relied on by other experts in

his field," "laid a sufficient foundation to support admission of his expert opinion" in compliance with Rule 703. *Payne*, 328 N.C. at 398, 402 S.E.2d at 594. Here, as in *Payne*, the statistics were "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences," *id.*, as allowed by Rule 703.

**[4]** Defendant further argues that his Sixth Amendment right to confront adverse witnesses was violated because Agent Spittle's testimony was based completely on hearsay. However, Agent Spittle's testimony was not based completely on hearsay. The only part of his testimony that was not based on his personal knowledge was the statistical database upon which he relied and which is admissible under Rule 703. The rest of his testimony was based on personal knowledge. Spittle himself conducted blood tests of the defendant, victim, and soiled materials and calculated the frequencies of the defendant's and victim's blood profiles occurring in the population. Defendant's Sixth Amendment right was not violated because "[t]he admission into evidence of expert opinion based upon information not itself admissible into evidence does not violate the Sixth Amendment guarantee of the right of an accused to confront his accusers where the expert is available for cross-examination." *State v. Huffstetler*, 312 N.C. at 108, 322 S.E.2d at 120-21.

### III.

**[5]** Defendant next contends that during his trial, the State impermissibly used written statements given by Jacobs and Brooks. When Jacobs and Brooks returned from their interstate truck haul the day after the murder, they gave oral statements to the police recounting their interaction with defendant prior to the victim's death. At trial, the prosecution used typewritten versions of these statements during direct examination of Jacobs and Brooks. The statements were prepared by police officers from their handwritten notes, and neither witness reviewed the written statements at any time before trial. Defendant contends that the State's use of the statements violates the hearsay exception for recorded recollection, N.C. Gen. Stat. § 8C-1, Rule 803(5), because the statements were not shown to have been adopted by the witnesses when the matter was fresh in their memories.

The record, however, indicates that the State did not use the witnesses' statements as substantive evidence. Rather, the prior statements were used either to refresh the witnesses' recollections,

or, in the case of Brooks, to impeach portions of his courtroom testimony which were inconsistent with them.

A statement used to refresh a witness's recollection need not be signed by him or even be his own prior statement:

> If upon looking at *any* document he can so far refresh his memory as to recollect a circumstance, it is sufficient; and it makes no difference that the memorandum is not written by himself, *for it is not the memorandum that is the evidence but the recollection of the witness.*

*State v. Smith*, 291 N.C. 505, 517, 231 S.E.2d 663, 671 (1977). Jacobs's prior statement was used exclusively to refresh his recollection. Jacobs testified that he had made truthful statements to the police, that because of the passage of time he couldn't remember the events in question very well, and that his memory at the time of those events was better than it was at the time of trial. The record reflects that once Jacobs read the statement to himself, he was able to testify as to what had happened. This is a proper use of a statement to refresh recollection.

Furthermore, defendant waived any objection as to Jacobs's statement by using it extensively himself on cross-examination, *State v. Adams*, 331 N.C. 317, 328, 416 S.E.2d 380, 385-86 (1992), and by failing to object to the use of the statements to refresh Jacobs's memory. N.C. R. App. P. 10(b)(1) (1993); N.C. Gen. Stat. § 8C-1, Rule 103 (1992).

As for Brooks, we note initially that defense counsel failed to object to the use of Brooks's prior statements either to refresh his memory or to impeach him. The defendant thereby waived any right to raise these objections on appeal. N.C. R. App. P. 10(b)(1) (1993); N.C. Gen. Stat. § 8C-1, Rule 103 (1992). Nevertheless, defendant's contentions would also fail on their merits. Throughout Brooks's testimony, his prior statement was used either to refresh his recollection or, when his testimony differed from the statement, to impeach him. It is permissible to use a prior statement to impeach a witness where there is proof that on another occasion he has made statements inconsistent with his testimony. *State v. Penley*, 277 N.C. 704, 178 S.E.2d 490 (1971); *State v. McKeithan*, 293 N.C. 722, 239 S.E.2d 254 (1977); 1 Henry Brandis on North Carolina Evidence § 46. At trial, Brooks acknowledged having made the prior statement. We have carefully scrutinized the trial transcript

and conclude that Brooks's statement was only used to refresh his recollection or, where appropriate, to impeach him, and not as substantive evidence.

## IV.

[6] Finally, defendant argues that during his trial, the State impermissibly used testimony from Agent Tom Sturgill. Agent Sturgill was part of a police team that questioned Jacobs on 10 March 1987 and was the officer who took Brooks's statement on 11 March 1987. At trial, Agent Sturgill testified as to what Jacobs and Brooks had said to the police. Defendant argues that the State improperly used this testimony to impeach the witnesses and to bolster the State's substantive evidence against him.

We note initially that during Agent Sturgill's testimony concerning Brooks's statement, defendant made no objections, thus waiving any right to appeal that would arise from that testimony. N.C. Gen. Stat. § 8C-1, Rule 103 (1992); N.C. R. App. P. 10(b)(1) (1993); See State v. Williamson, 333 N.C. 128, 138, 423 S.E.2d 766, 771 (1992).

When Agent Sturgill was asked about what Jacobs had said in the 10 March 1987 interview, defendant did object and an off-the-record discussion occurred. However, testimony then resumed. No entry was made in the record as to the reason for that initial objection, and no further objection was made to any part of Sturgill's testimony about Jacobs's statement. Where a statement contains both corroborative and non-corroborative evidence, the defendant must object specifically to the inadmissible portions. "Objections to evidence *en masse* will not ordinarily be sustained if any part is competent." *State v. Brooks*, 260 N.C. 186, 189, 132 S.E.2d 354, 357 (1963). *See also State v. Harrison*, 328 N.C. 678, 682, 403 S.E.2d 301, 304 (1991). Defendant's objection was therefore not sufficiently specific to preserve his right of appeal.

Sturgill's testimony as to both witnesses' prior statements is thus reviewable only for plain error. *State v. Odom*, 307 N.C. 655, 300 S.E.2d 375 (1983). Under the plain error standard, the appellate court must be "convinced that absent the error the jury would have reached a different verdict." *State v. Reid*, 322 N.C. 309, 313, 367 S.E.2d 672, 674 (1988). *See also State v. Harrison*, 328 N.C. at 687, 403 S.E.2d at 306 (Erroneous admission of prior state-

ment of one witness is not plain error where testimony of another witness established the same facts).

There is substantial evidence against defendant which in no way depends upon the written statements of Brooks and Jacobs nor upon the testimony of Sturgill as to the contents of those statements. Given the weight of this other evidence, we find that Sturgill's testimony did not constitute plain error requiring a reversal.

For the foregoing reasons, we conclude that the defendant received a fair trial free from prejudicial error.

No error.

Judges LEWIS and McCRODDEN concur.