IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA17-669

 Filed: 3 July 2018

Wilson County, No. 15 CRS 1614-15, 15 CRS 50196, 15 CRS 50200, 15 CRS 50204,
15 CRS 50247, 15 CRS 50473

STATE OF NORTH CAROLINA,

 v.

JIMMY LEE FORTE, JR., Defendant.

 Appeal by Defendant from judgment entered 27 July 2016 by Judge Robert F.

Johnson in Wilson County Superior Court. Heard in the Court of Appeals 22 March

2018.

 Attorney General Joshua H. Stein, by Special Deputy Attorney General Grady
 L. Balentine, Jr., for the State.

 Appellate Defender Glenn Gerding, by Assistant Appellate Defender Hannah H.
 Love, for defendant-appellant.

 HUNTER, JR., Robert N., Judge.

 Jimmy Lee Forte, Jr. (“Defendant”) appeals from judgments entered upon jury

verdicts finding him guilty of seven counts of larceny of a firearm, two counts of

breaking and entering, two counts of larceny after breaking and entering, and one

count each of breaking and entering a motor vehicle, misdemeanor larceny, and

possession of firearm by a felon. The jury also found Defendant attained habitual

felon status. On appeal, Defendant contends the trial court erred by (1) allowing

Defendant to represent himself because he forfeited his right to counsel; (2) entering
 STATE V. FORTE

 Opinion of the Court

judgment for eight counts of felony larceny where all of the property was stolen in a

single transaction; and (3) failing to dismiss the misdemeanor larceny charge where

the evidence at trial failed to comport with the indictment. Defendant also contends

the trial court lacked jurisdiction to sentence him as a habitual felon because the

indictment was fatally defective. The State concedes the trial court erred in entering

judgment for eight counts of felony larceny when the property was all stolen in a

single transaction. Accordingly, we vacate seven of the eight counts of felony larceny

and remand for sentencing on one count of felony larceny. We also conclude the

habitual felon indictment is fatally defective and therefore vacate Defendant’s

habitual felon status. We otherwise find no error.

 I. Factual and Procedural History

 On 12 October 2015, a grand jury indicted Defendant on seven counts of

larceny with a firearm, three counts of breaking and entering, three counts of larceny

after breaking and entering, and one count each of breaking and entering a motor

vehicle, misdemeanor larceny, felonious possession of burglary tools, possession of a

firearm by a felon, habitual breaking and entering, and having attained habitual

felon status.

 On 18 July 2016, Defendant’s case came on for trial. Darryl Smith (“Smith”)

represented Defendant. Prior to motions in limine, the trial court addressed Smith’s

motion to withdraw due to “irreconcilable differences” with Defendant.

 -2-
 STATE V. FORTE

 Opinion of the Court

 Smith explained his relationship with Defendant began with a “little difficulty”

because Defendant wanted to go to trial within two to three weeks of Smith’s

appointment. Smith felt he and Defendant had a productive relationship initially,

but the relationship deteriorated over discovery disputes. Additionally Smith stated:

 [Defendant] has refused to answer questions about
 the case, frequently interrupts when we discuss the case.
 He argues about issues that are not in dispute between him
 and the State or as far as I know between him and me.
 States he will present evidence to the Court but refuses to
 tell me the substance of what it is he wants to present to
 the Court. . . .

 He says that he has said a couple of times he doesn’t
 believe what I have said about the law that applies to the
 case, has written numerous letters to District Court and
 Superior Court judges, couple of which have included,
 which I have not discussed with him, but that his
 handwriting and he can say no telling what he will do next
 time he sees me.

Defendant told the court Smith made false statements and had not received complete

discovery. Defendant also stated if Smith did receive complete discovery, he had not

shared it with him. After hearing from Smith and Defendant, the following occurred:

 THE COURT: Listen to me. Time for you to stop
 talking.

 [DEFENDANT]: He told me - -

 THE COURT: Listen to me. Listen to me.

 [DEFENDANT]: Yes, sir.

 THE COURT: You have a right to be represented by

 -3-
 STATE V. FORTE

 Opinion of the Court

an attorney in trial.

 [DEFENDANT]: I haven’t had my Motion For
Discovery, sir. I keep saying that over 18 months. It’s not
a fair trial. It’s irreparable prejudice.

 THE COURT: Sir, I have told you to stop talking.

 You have a right to be represented by an attorney.
If you cannot afford an attorney, the Court will appoint one.
The Court has appointed an attorney for you. As a matter
of fact, Mr. Smith is the third attorney.

 [DEFENDANT]: He hasn’t given my Motion For
Discovery, sir.

 THE COURT: Listen to me. Sir - -

 [DEFENDANT]: He still ain’t answering my
question.

 THE COURT: Sir, sir, you are making, you are
making life tough for yourself.

 [DEFENDANT]: Sir, I’m entitled to this. It’s a copy
right here, Defendant is entitled to the order. So if he got
it, I don’t have it. I’m entitled to have it, sir. That is
prejudice to my case. I’m not going to go up here and - -

 THE COURT: Mr. Smith, is this the kind of
problems that you’ve experienced with this client?

 MR. SMITH: Yes, sir.

 [DEFENDANT]: I have a copy right here.

 THE COURT: In other words, when you’re trying to
talk to him he interrupts? Is that what you’ve been
experiencing?

 -4-
 STATE V. FORTE

 Opinion of the Court

 MR. SMITH: Yes, sir.

 THE COURT: He’s not been cooperating with you
 as counsel?

 MR. SMITH: That’s correct.

 THE COURT: Have you explained to him what
 waiver of counsel, waiver of his right to counsel is, in other
 words, voluntary waiver and he can go to trial and without
 the benefit of counsel - -

 [DEFENDANT]: I didn’t voluntary waiver.

 THE COURT: - - by continuing to be uncooperative
 and continuing to interrupt? Have you talked to him about
 that kind of thing?

 The trial court directed Smith to take Defendant to a conference room and

advise Defendant his behavior could result in Defendant “involuntarily waiving” or

“forfeiting his right to counsel.” The trial court stated if Defendant is “forfeiting his

right to counsel then he’s going to be on his own representing himself.” Defendant

disagreed and stated, “I’m right in front of you and I’m saying I’m not forfeiting my

right.” The trial court explained “that is a determination that I will make as the

judge in the case and not one that he as the Defendant will make.” Defendant and

Smith then exited the courtroom.

 Upon their return, Smith summarized his conversation with Defendant for the

trial court and stated “[t]here still might be a misunderstanding.” Smith also told

the court Defendant did not want Smith to represent him, and asked the court to

 -5-
 STATE V. FORTE

 Opinion of the Court

“appoint another lawyer to represent [Defendant].” Here, Defendant again

interrupted the trial court, and the court stated:

 Mr. Forte, one of the problems that you have is you
 keep interrupting. We follow a procedure in court and right
 now Mr. Smith is addressing the Court. I want to hear
 what he has to say. When I give you an opportunity I’ll
 give you an opportunity to speak but you need to
 understand something else. When I’m trying to speak to
 you or advise you or anything else, you need to listen and
 not be interrupting and not be trying to argue so right now
 --

Defendant interrupted the trial court again.

 Later, Defendant addressed the trial court regarding his problems with

discovery and stated, “If I would have had a chance, if I may approach the bench, I

can let you see all the discovery I have.” The trial court responded, “Why don’t you

take the paper work that you have there, hand it to Mr. Smith and, Mr. Smith, you

bring it up to me.” Defendant then stated, “I been having such a hard time just to get

this part, sir, it’s like I’m kind of shell shocked. I hate to get this out of my hands

without standing there watching. Can I stand up and see?” The trial court refused

Defendant’s request. Defendant said, “I don’t feel comfortable putting paper work in

his hands. I don’t feel comfortable.” Here, the trial court said, “You don’t feel

comfortable handing it to your lawyer in the courtroom who’s less than 20 feet from

me and have him bring it up to me on the bench.” Defendant then stated, “There you

go, sir. . . . It’s been hard enough for me to get these copies that’s what being, you

 -6-
 STATE V. FORTE

 Opinion of the Court

know, kind of my behavior, sir.” The trial court then concluded, “Well, I’ll be honest

with you, Mr. Forte, it appears to me your behavior in the court, something as simple

for you to hand it to your lawyer and have him hand it up, appears to me to be

obstructive.”

 Further into the hearing, the trial court tried to understand why Defendant

had issues with his second and third counsel, and review with Defendant his right to

counsel. The trial court stated, “Mr. Forte - - I want the record to reflect that Mr.

Forte continuously interrupts the Court. He has for the last two hours, that Mr. Forte

continuously refuses to listen to the questions and answer the questions as the Court

is trying to go through his rights to counsel.”

 Ultimately, the trial court stated:

 This Court finds . . . the Defendant continuously refuses to
 cooperate fully with his lawyer, continues to be
 argumentative not only with his counsel but also with this
 Court. The Court finds that the Defendant’s actions are
 willful, that they are intentional and they are designed to
 obstruct and delay the orderly trial court proceedings. The
 Court finds that the Defendant has, therefore, forfeited his
 right to court-appointed counsel.

The trial court then appointed Smith to serve as Defendant’s standby counsel.

 The State first called William Hitchcock (“Hitchcock”), a detective with the

Wilson Police Department. On 16 January 2015, Hitchcock received a “break-in call.”

Pursuant to this call, Hitchcock went to a single family residence at 4104 Little John

Drive in Wilson, North Carolina. The break-in occurred at this residence where a

 -7-
 STATE V. FORTE

 Opinion of the Court

window was broken, and there was missing property. Hitchcock spoke to the victim,

Mrs. Winbourne (“Winbourne”) to “gauge” the items taken. Winbourne told

Hitchcock, “There were several firearms stolen and several pieces of jewelry.”

Detective Liggins (“Liggins”), another detective on the scene, surveyed the

neighborhood with Hitchcock. Together they knocked on neighbor’s doors to look for

witnesses. However, no one saw anything.

 Hitchcock testified he normally visits pawn shops to look for stolen goods.

Before Hitchcock could go to a pawn shop, and while he was still at the Winbourne’s

residence, he received a phone call from his sergeant. Hitchcock’s sergeant informed

him Defendant was riding a bike on Lake Wilson Road. Hitchcock then left the

Winbourne’s residence and went to Lake Wilson Road where he found Defendant, and

stopped him. Hitchcock told Defendant there had been a break-in in the area.

Hitchcock asked Defendant if he could search him, and Defendant consented. Upon

searching Defendant, Hitchcock found a “tool used to snip metal,” and a coin “with

the initials “K.H.” engraved on it. These items were in Defendant’s pockets. The coin

was a silver dollar.

 Hitchcock believed the “K.H.” stood for Keith Hill (“Hill”). Hill was a victim in

a Country Club break-in prior to 16 January 2015. Defendant told Hitchcock the

coins belonged to his father. Because Hill’s missing coins closely matched the coin in

Defendant’s possession, Hitchcock arrested Defendant for “possession of stolen goods

 -8-
 STATE V. FORTE

 Opinion of the Court

and possession of burglary tools.” Hitchcock read Defendant his Miranda rights and

transported Defendant to the Wilson Police Department. Also at the police

department, Hitchcock called Mr. Hill and “had him describe some of the coins he had

stolen which the coin we recovered from [Defendant] did match the description from

his break-in.”

 Hitchcock and Liggins later went to Defendant’s home. Hitchcock stated:

 We had been advised that [Defendant] had been
 locked out of his house during the day and we thought if he
 had possibly been a suspect in the break-in on Little John
 [Drive] that the property would be somewhere either near
 his property or on his property outside, if he didn’t have a
 way to get into the house.

 Upon arriving at Defendant’s residence, Hitchcock spoke to Defendant’s

mother, Viola Forte (“ Ms. Forte”). There, Hitchcock “asked her for consent to search

the outside of her residence as well as any common areas in the residence.” Ms. Forte

gave a written consent to the search. Hitchcock testified:

 We didn’t go inside the house because we thought if
 you were locked out of the house there was no way he could
 have brought the property inside if he didn’t have a key.
 So we just searched the, we searched his yard, the front
 yard, the back yard as well as there was some paths off of
 Lake Wilson Road.

Hitchcock “was standing next to Detective Liggins when he found a pillowcase

underneath the shed in the back yard which contained several pieces of property

[they] believed to be stolen at the time.” This property included “two handguns,

 -9-
 STATE V. FORTE

 Opinion of the Court

firearms, and jewelry.” The handguns appeared to be “Browning handguns,” which

were “not the most common firearm that we typically have reported stolen[.]”

 Hitchcock was later able to “locate” a few of the owners of the property in the

pillowcase. There was a “blue and silver some type of tennis bracelet that belonged

to Nicole Neamer who had experienced a break-in recently in the Belle Meade

subdivision.” Additionally, Hitchcock was “able to identify the firearms as some of

the ones that were reported stolen from the Little John Drive incident that happened

earlier that day.”

 Later that day, Hitchcock received a phone call from Defendant’s father. As a

result of that phone conversation, Hitchcock and Liggins returned to Defendant’s

residence. Once there, Hitchcock and Liggins received verbal consent to search the

attic. There was a lot of property in the attic, such as “jewelry, sunglasses,

ammunition, [and a] shotgun[.]” Hitchcock and Liggins “seized” the property and

returned to the police department.

 The State next called Hill. Hill came home from vacation with his wife on 29

December 2014. He noticed the door inside his garage was ajar, and he entered the

house. “And then when I went into the house, we went to the bedroom, I found several

of the my wife’s dresser drawers open. I found several of my dresser drawers open. I

found the nightstand drawer open. And there were pieces of jewelry laying on the

floor.”

 - 10 -
 STATE V. FORTE

 Opinion of the Court

 Additionally:

 After we, I saw the dresser drawers opened, I looked and
 my wife has a little box that she keeps her jewelry in. That
 was gone. I then looked in my dresser drawer. I found - -
 I have a box that I keep my cuff links and some other items
 in. That was missing. I have several, right beside that box
 I had several $2 bills and some silver certificate bills. They
 were missing.

Hill called the Wilson Police Department, who immediately responded and helped

Hill search his house. Hill discovered he was missing a “mint condition silver dollar.”

Hill knew the silver dollar was from the 1800’s, and it had his initials engraved on it.

Hitchcock returned the silver dollar to Hill “on or about the 16th or 17th of January.”

 The State next called Winbourne. Winbourne came home for lunch on 16

January 2015. She pulled her car into her garage and noticed her door inside the

garage was ajar. As soon as she entered the kitchen through her garage, she saw

broken glass on the floor from her back door. At that point, she screamed and “turned

around and ran out of the house” and called 911. The police responded and checked

the house to make sure it was safe for Winbourne to go inside.

 Winbourne testified she was missing a tennis bracelet after the break-in. She

was also missing some silver dollars, some watches, and a “Tiffany key” pendant on

a “long Tiffany necklace.” Winbourne later identified her stolen items at the police

department on the same day as the break-in. The police told Winbourne her items

 - 11 -
 STATE V. FORTE

 Opinion of the Court

were discovered at Defendant’s residence, which was not far from her home.

Winbourne also identified the pillowcase containing her stolen items as hers.

 The State next called Kenneth Alan Winbourne (“Mr. Winbourne”). On 16

January 2015, Mr. Winbourne was at work when he received a phone call from his

wife. Mrs. Winbourne told him “somebody had threw a brick through the back glass

on the door[.]” Mr. Winbourne immediately came home. When he arrived home, he

could see his “house was in disarray.” Mr. Winbourne kept two handguns on the right

side of his bed. The bedside drawer was “pulled out” and then “the first thing I done

I turned around and looked at the dresser behind me is where I keep my dad’s guns

and all those were gone and there was a shotgun in the corner and it was gone.” Mr.

Winbourne was able to identify all his missing guns at the police office later that day.

 The State next called Nicole Nemer (“Nemer”). On 11 January 2015, Nemer’s

friend went to Nemer’s house to deliver some flowers. The friend discovered Nemer’s

house had been broken into, and called the Wilson Police. Nemer arrived at her home

approximately 40 minutes later. Nemer saw the window next to her back door had

been broken, “so that they could get in to unlock my door.” Nemer kept her jewelry

“lined up” in her walk-in closet. Nemer was missing her “grandmother’s sapphire

and diamond ring, a gold necklace . . . [a] sapphire and diamond necklace, sapphire

diamond bracelet and a couple of [her] larger more expensive pieces that were given

as gifts[.]” She was also missing more than $2,000 in cash. On 16 January 2015,

 - 12 -
 STATE V. FORTE

 Opinion of the Court

Nemer identified her sapphire and diamond bracelet at the police station. The police

found the bracelet in the “very bottom of the pillowcase.” She got her bracelet back

that same day.

 The State next called Glen Cox (“Cox”). Cox is employed by “[f]amily owned

business, Cox Auto Salvage.” On or about 12 January 2015, Cox contacted Detective

Mayo (“Mayo”) of the sheriff’s department to “let him know [Cox’s] truck had been

broken into.” Cox had business papers inside his truck that “were shuffled around.”

Cox testified at the time he “didn’t see anything missing but somebody had obviously

been inside [his] truck.” Mayo encouraged Cox to file a police report. A few days

later, Cox “needed to pay a customer” and realized his “company checkbook was

missing.” Cox contacted Mayo. Mayo returned the checkbook to Cox, but Cox had

already canceled the missing checks.

 On cross, Cox testified Mayo called him and asked him if he was missing a

checkbook. Mayo then brought the checkbook to Cox. Cox was able to identify the

checkbook because “[i]t had stubs of checks that [he] had written[,]” and “[i]t had [his]

name on it.”

 The State next called Liggins, a police officer with the Town of Clayton. On 16

January 2015, Liggins was a detective with the Wilson Police Department. That day,

Liggins, along with Hitchcock, responded to a break-in at 4104 Little John Drive.

Liggins stayed at the scene for about 15 to 20 minutes. Hitchcock received a phone

 - 13 -
 STATE V. FORTE

 Opinion of the Court

call from his sergeant, and as a result, Liggins accompanied Hitchcock to Lake Wilson

Road. There, Liggins encountered Defendant, and stopped him. Liggins watched

Hitchcock speak with Defendant. Liggins also watched Hitchcock get Defendant’s

consent to a search. Liggins then saw Hitchcock arrest Defendant and take him into

custody. At this time, Liggins was about five feet from Hitchcock and Defendant, and

could hear everything. Defendant “had a coin on him that Detective Hitchcock told

[Liggins] it was from a break-in that he was investigating as well as some type of

tool.” Liggins accompanied Hitchcock and Defendant to the police station.

 Liggins later went with Hitchcock to Defendant’s residence. There,

Defendant’s mother gave Liggins and Hitchcock a written consent to search. During

the search of the back yard, Liggins “noticed a piece of cloth hanging out from under

the storage shed.” Liggins then “walked over and pulled it out which ended up being

a pillowcase.” Liggins opened the pillowcase and found “firearms, handguns, as well

as jewelry.” Liggins showed the items to Hitchcock. They returned to the police

department.

 At the police department, Liggins made sure Defendant understood his

Miranda rights and, less than one hour later, Liggins took Defendant’s statement.

Defendant gave his statement orally, and Liggins transcribed Defendant’s statement.

Once Liggins finished writing Defendant’s statement, Liggins allowed Defendant to

read his statement. Liggins gave Defendant the opportunity to add to or retract his

 - 14 -
 STATE V. FORTE

 Opinion of the Court

statement. Defendant signed the statement after he read it. Liggins read

Defendant’s statement for the jury:

 About two weeks ago I was walking around the Country
 Club. I walked around for a few days. I noticed nobody
 was around the house . . . . The little garage door was open.
 I checked it and it was unlocked . . . . I went inside and got
 some men and women’s jewelry and some coins . . . . I also
 got some $2 bills. I spent the $2 and some bills at the store
 on Elizabeth Road. I took some of the coins to a store on
 Airport Boulevard. The guy at the store on Airport bought
 about three of the coins and he gave me about $15 per coin.
 My mom left this morning and I can’t stay in the house
 when she is gone because I stole from her. I chose the
 house this morning because it is a low key area. I walked
 up to the house and rang the doorbell. . . . [N]obody. . . .

 Came to the door . . . . I saw a pile of bricks and went
 and got one. I took the brick and smashed the back door. I
 went inside and grabbed the stuff. I got two pistols, some
 jewelry and a few coins . . . . I got a pillowcase and put the
 stuff in there and left and I was on foot. I walked back to
 my house. I stashed the stuff under the building in the
 back yard . . . . I used the money to buy crack . . . . I went
 behind the laundromat in the woods and smoked crack and
 then I headed back toward home. Then the police stopped
 me. The coin I had in my pocket was from the B&E in the
 Country Club . . . . I’m sorry for what I did and I need
 help. . . . I did this because I’m on drugs.

 The State next called Sarah Sallenger Jones (“Jones”). Jones is an official

record keeper and deputy clerk with the Wilson County Clerk’s Office. The State

handed Jones a file for defendant. The file contained the “Judgment and

Commitment for Active Punishment Felony Charge” for breaking and/or entering.

The form reflected Defendant committed breaking and/or entering on 27 July 2003,

 - 15 -
 STATE V. FORTE

 Opinion of the Court

and was convicted of that offense on 8 March 2004. Defendant received “seven to nine

months North Carolina D.O.C.”

 The State rested. Defendant moved to dismiss all the cases against him due

to insufficient evidence. The trial court denied Defendant’s motion. The trial court

then asked Defendant if he planned to put on additional evidence. Defendant

responded, “Yes, sir.” The trial court advised Defendant of his rights regarding his

testifying. The trial court gave Defendant an opportunity to discuss testifying with

his stand-by counsel.

 Defendant took the stand. On 16 January 2015, Defendant woke up, bathed,

dressed, and made breakfast. Defendant’s mother left home to go to work. Defendant

took his breakfast outside and sat on the porch. A man named J.T. called Defendant

and asked him if he had any “crack.” Defendant said he did, and J.T. told Defendant

he was on his way to Defendant’s home. Defendant then finished his breakfast, threw

away his trash, and smoked a cigarette. J.T. wanted to pay for the drugs with some

property, but Defendant told him he needed cash. J.T. then “left, came back, got some

drugs from me for piece.” J.T. paid Defendant with “a bracelet and two watches and

three antique coins as well as $30 in change to turn out to be $15 in quarters and $15

in nickel, dimes and pennies[.]” Defendant asked J.T.

 A little while later, Defendant rode his bike across town and stopped at an

antique coin shop. J.T. had previously sold a coin to Defendant, and Defendant

 - 16 -
 STATE V. FORTE

 Opinion of the Court

visited that shop to learn the coin’s value. Defendant disagreed with the shop’s owner

over the coin’s value. Defendant then rode his bike to Ward Boulevard and got a

drink. After that, Defendant went to Southern Bank on Tarboro Street and

exchanged $15 dollars in quarters for dollars. Defendant next rode to his cousin’s

house to smoke marijuana. He stayed there approximately 30 minutes. When

Defendant left his cousin’s home, he went back across town on West Nash. He took

a short cut through the Food Lion parking lot and came out on Lake Wilson Road to

escape traffic.

 Defendant saw a “detective car” as he came out of the parking lot. Sergeant

Lamm and two unknown officers were in that car. Defendant noticed another

“detective car” as he turned onto Lake Wilson Road. Hitchcock, Liggins, and another

officer were in this second car. Defendant testified, “Detective Hitchcock got his

window down like waving me down saying he needed to talk to me which I yelled

back, you don’t need to talk to me and I don’t need to talk to you.” Hitchcock then

pulled his car into the center lane. Everyone in Hitchcock’s car exited and approached

Defendant on the sidewalk. The officers in the first “detective car” also stopped and

approached Defendant.

 Hitchcock asked Defendant where he was headed. Defendant responded, “sir,

you don’t need to talk to me and I don’t need to talk to you. I said, I got my I.D. on

me.” Hitchcock then told Defendant he would be under arrest if Defendant did not

 - 17 -
 STATE V. FORTE

 Opinion of the Court

answer his questions. Defendant told Hitchcock he was going to his parents’ house.

Hitchcock informed Defendant there had been a break-in on St. George Drive, and

“one man ring, two men watches . . . one or two women watches, some women rings

and a bracelet” were missing. Additionally, there was another break-in at 4104 Little

John Drive where “$2 bills, some coins, jewelry, two firearms from the dresser, a

shotgun, and four more handguns” were stolen. Hitchcock stated he needed to search

Defendant for weapons, and Defendant did not consent to the search. Hitchcock

again said he needed to search for weapons. Since six officers were present,

Defendant did not want to “resist.” Hitchcock searched Defendant and found a pair

of wire cutters and a coin J.T. gave to Defendant in exchange for drugs. Hitchcock

asked Defendant why he had wire cutters, and Defendant responded he used them to

cut copper wire from an old A.C. unit in his parents’ backyard. Defendant also told

Hitchcock he got the coin from his father.

 Defendant testified:

 I regret not telling him that I had bought it from the guy,
 J.T., but I really didn’t know the guy J.T. name. I only
 knew his number. And I feel like if I said I got it from J.T.,
 J.T. could have simply denied it and he still would have
 believed I did these enterings because, as you discovered
 today, I have had a record.

Hitchcock handcuffed Defendant and informed Defendant he was being detained.

Hitchcock then asked Defendant for his father’s cell phone number. Defendant

complied. Hitchcock then went to Defendant’s parents’ house.

 - 18 -
 STATE V. FORTE

 Opinion of the Court

 According to Defendant:

 All three officers get out their unmarked car. One of the
 officers grabbed my bike which I immediately looked at
 when they grabbed my bike they was searching my
 parents’ yard when they were not home without my
 parents’ consent which then Detective Hitchcock then
 asked me my dad’s number again.

One officer put Defendant’s bike on the porch. That same officer opened Defendant’s

parents’ fence. Before the officer entered the back yard, Hitchcock exited the car.

Hitchcock yelled something toward that officer, but Defendant was unable to hear.

Liggins and Hitchcock both entered Defendant’s car and drove to the police station.

Sergeant Lamm and the three other officers stayed at Defendant’s home.

 At the police station, Hitchcock questioned Defendant about the prior breaking

and enterings. Defendant told Hitchcock, “I didn’t commit that crime.” Hitchcock

gave Defendant a form explaining Defendant’s rights, and Defendant refused to sign

the form. Defendant then heard Hitchcock whisper to Liggins, “see if I can go back

to Forte’s parents’ house and speak with his mother[.]” Hitchcock left, and Detective

Battle took Defendant to get fingerprinted and “booked.” Defendant then returned

to the interview room where Hitchcock read Defendant his rights. Hitchcock told

Defendant, “[W]e just got back to your parents’ house; that she gave us consent to

search.” He also told Defendant, “[W]e found four firearms and a shotgun in plain

view under the barn . . . [and] a pillowcase with two more handguns . . . [with] some

jewelry and coins.” At this point, Defendant denied having knowledge about those

 - 19 -
 STATE V. FORTE

 Opinion of the Court

items. Hitchcock then told Defendant if he did not know anything, then his parents

would be charged. Defendant felt threatened and coerced, so he admitted to the

crimes. Defendant testified:

 He actually seen me break down stating that I didn’t do it
 the whole time but he still coerced me, come on, you did it;
 you did it, like, you know what I’m saying, so he’s coercing
 me through it, which he also during that coercion he
 actually, the only part he didn’t coerce me to I added the
 part about the crack.

 Defendant rested. Defendant moved to dismiss all the charges at the close of

the evidence based on the insufficiency of the evidence. The trial court denied

Defendant’s motion to dismiss on all counts except for the charge of possession of

burglary tools.

 The jury returned unanimous verdicts of guilty of seven counts of larceny of a

firearm; two counts of felony breaking or entering; two counts of larceny after

breaking or entering; one count of possession of a firearm by a felon; one count of

breaking or entering a motor vehicle; and one count of misdemeanor larceny. The

jury also found Defendant not guilty of one count of felony breaking or entering and

larceny after breaking or entering. Additionally, the jury found Defendant guilty of

obtaining habitual felon status.

 The trial court found Defendant had six prior sentencing points making him a

prior record level III. The trial court sentenced Defendant to two consecutive terms

of 15 days in the county jail for contempt of court. The trial court stated:

 - 20 -
 STATE V. FORTE

 Opinion of the Court

 Now, with regard to case file 15-CRS-50200, the
Defendant having been found guilty of felony breaking or
entering, guilty of felony larceny after breaking or entering
and guilty of the felony of larceny of a firearm . . . the Court
consolidates those three counts for one judgment and it is
the judgment of the Court that the Defendant be confined
to a minimum of 84 months, maximum 113 month in the
North Carolina Department of Corrections. This sentence
to begin at the expiration of sentences for contempt of
court.

....

 All right. Now with regard to 15-CRS-50247, the
jury having found the Defendant guilty of Class G Felony
of possession of firearm by a felon, the Court sentences him
as a prior Record Level III to a minimum 96 months,
maximum 128 months to commence at the expiration of the
sentence imposed in 15-CRS-50200.

 With regard to the six counts of felony larceny by
firearm, let the record reflect that the Defendant having
been found guilty of the six Class H Felonies, those felonies
now being punishable as a Class D Felony because of
habitual felon status, the Court sentences the Defendant
to 84 months minimum, 113 months maximum in the
North Carolina Department of Corrections and
consolidates those for judgment with possession of firearm
by felon which is punishable as a Class G Felon in 15-CRS-
50247.

....
 Consolidating the six firearms by felon with the
possession of firearm by felon. The 96 to 128 months run
at the expiration of 15-CRS-50200.

....

 In . . . case 15-CRS-50196, and that’s the breaking
and entering and the larceny from the Hill’s home at 4602

 - 21 -
 STATE V. FORTE

 Opinion of the Court

 St. George’s Drive, it is the judgment of the Court that the
 Defendant be confined North Carolina Department of
 Corrections for a minimum of 84, maximum 113 months to
 run at the expiration of the judgment imposed in 15-CRS-
 50247.

 ....

 All right. In case file 15-CRS-50473, the Defendant
 having been found guilty of felonious breaking or entering
 a motor and guilty of misdemeanor larceny, consolidate
 those two counts into one judgment. The breaking and
 entering of a motor vehicle ordinarily being a Class I
 Felony is elevated because of the Defendant’s habitual
 felon status to a Class E punishment. It is the judgment of
 the Court that the Defendant be confined to the North
 Carolina Department of Corrections for a minimum of 33,
 maximum 52 months.

 That sentence will run concurrent with the
 judgment imposed in 15-CRS-50196.

Following sentencing, Defendant orally appealed.

 II. Standard of Review

 “The standard of review for alleged violations of constitutional rights is de

novo.” State v. Graham, 200 N.C. App. 204, 214, 683 S.E.2d 437, 444 (2009), appeal

dismissed and disc. review denied, 363 N.C. 857, 694 S.E.2d 766 (2010).

 “This Court reviews the trial court’s denial of a motion to dismiss de novo.”

State v. Smith, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007).

 - 22 -
 STATE V. FORTE

 Opinion of the Court

 Additionally, this Court “review[s] the issue of insufficiency of an indictment

under a de novo standard of review.” State v. Marshall, 188 N.C. App. 744, 748, 656

S.E.2d 709, 712 (2008).

 III. Analysis

 In his first assignment of error, Defendant argues the trial court erred in

allowing Defendant to represent himself because he did not waive his right to counsel,

forfeit his right to counsel, or lose his right to counsel through waiver by conduct.

Specifically, Defendant contends the trial court erred in allowing Defendant to

represent himself because it didn’t conduct the required inquiry under N.C. Gen. Stat.

§ 15A-1242 for a defendant who voluntarily waives counsel. Defendant bases his

argument on the premise the trial court found Defendant voluntarily waived his right

to counsel. However, our review of the record indicates Defendant did not waive his

right to counsel, but rather forfeited counsel through his conduct. Because we

conclude Defendant forfeited his right to counsel, the trial court did not err in failing

to conduct the § 15A-1242 inquiry.

 A defendant’s right to counsel is a “fundamental component of our criminal

justice system,” guaranteed by the Sixth and Fourteenth Amendments of the U.S.

Constitution and Article I of the North Carolina Constitution. United States v.

Cronic, 466 U.S. 648, 653, 80 L. Ed. 2d 657, 668 (1984). This includes the right of an

indigent defendant to appointed counsel. N.C. Gen. Stat. § 7A-450 (2017); Gideon v.

 - 23 -
 STATE V. FORTE

 Opinion of the Court

Wainwright, 372 U.S. 335, 339-56, 9 L. Ed. 2d 799, 802-06 (1963). However, our State

appellate courts have recognized two circumstances under which a defendant may no

longer have the right to be represented by counsel. State v. Blakeney, 245 N.C. App.

452, 459, 782 S.E.2d 88, 93 (2016). First, a defendant may voluntarily waive the right

to be represented by counsel. Id. at 459, 782 S.E.2d at 93. Second, a defendant who

engages in serious misconduct may forfeit his constitutional rights to counsel. Id. at

460, 782 S.E.2d at 93.

 Courts have referred to the situation where a defendant loses counsel though

his own conduct as waiver. State v. Montgomery, 138 N.C. App. 521, 524, 530 S.E.2d

66, 69 (2000). However, “a better term to describe this situation is forfeiture.” Id. at

524, 530 S.E.2d at 69. “ ‘Unlike waiver, which requires a knowing and intentional

relinquishment of a known right, forfeiture results in the loss of a right regardless of

the defendant’s knowledge thereof and irrespective of whether the defendant

intended to relinquish the right.’ ” Id. at 524, 530 S.E.2d at 69 (quoting United States

v. Goldberg, 67 F.3d 1092, 1100 (3d. Cir. 1995)). “ ‘Any willful actions on the part of

the defendant that result in the absence of defense counsel constitutes a forfeiture of

the right to counsel.’ ” State v. Leyshon, 211 N.C. App. 511, 518, 710 S.E.2d 282, 288

(2011) (quoting State v. Quick, 179 N.C. App. 647, 649-50, 634 S.E.2d 915, 917 (2006)).

Typically, forfeiture occurs when a defendant obstructs or delays the proceedings by

 - 24 -
 STATE V. FORTE

 Opinion of the Court

refusing to cooperate with counsel or refusing to participate in the proceedings. See

Blakeney at 460, 782 S.E.2d at 94-95.

 However, unlike forfeiture, a “[d]efendant’s waiver of counsel must be ‘knowing

and voluntary, and the record must show that the defendant was literate and

competent, that he understood the consequences of his waiver, and that, in waiving

his right, he was voluntarily exercising his own free will.’ ” State v. Reid, 224 N.C.

App. 181, 190, 735 S.E.2d 389, 396 (2012) (quoting State v. Thacker 301 N.C. 348,

354, 271 S.E.2d 252, 256 (1980)). Before a trial court allows a defendant to waive

representation by counsel, “the trial court must insure that constitutional and

statutory standards are satisfied.” State v. Moore, 362 N.C. 319, 322, 661 S.E.2d 722,

724 (2008) (internal quotation marks and citations omitted). A trial court will satisfy

both the statutory and constitutional standards if it conducts its inquiry pursuant to

N.C. Gen. Stat. § 15A-1242. Id. at 322, 661 S.E.2d at 724 (citations omitted).

 N.C. Gen. Stat. § 15A-1242 (2017) provides the following:

 A defendant may be permitted at his election to
 proceed in the trial of his case without the assistance of
 counsel only after the trial judge makes thorough inquiry
 and is satisfied that the defendant:

 (1) Has been clearly advised of his right to the assistance
 of counsel, including his right to the assignment of counsel
 when he is so entitled;

 (2) Understands and appreciates the consequences of this
 decision; and

 - 25 -
 STATE V. FORTE

 Opinion of the Court

 (3) Comprehends the nature of the charges and proceedings
 and the range of permissible punishments.

Id.

 Here, neither Defendant nor the State asserts Defendant ever asked to

represent himself at trial. Additionally, our review of the record does not reveal any

indication Defendant requested to proceed pro se. This Court concludes the case at

bar is not governed by appellate cases addressing a trial court’s responsibility to

ensure a defendant who wishes to represent himself is “knowingly, intelligently, and

voluntarily” waiving his right to counsel. State v. Thomas, 331 N.C. 671, 674, 417

S.E.2d 473, 476 (1992).

 As to forfeiture, “there is no bright-line definition of the degree of misconduct

that would justify forfeiture of a defendant’s right to counsel.” Blakeney at 461, 782

S.E.2d at 94. This Court has stated:

 [F]orfeiture has generally been limited to situations
 involving “severe misconduct” and specifically to cases in
 which the defendant engaged in one or more of the
 following: (1) flagrant or extended delaying tactics, such as
 repeatedly firing a series of attorneys; (2) offensive or
 abusive behavior, such as threatening counsel, cursing,
 spitting, or disrupting proceedings in court; or (3) refusal
 to acknowledge the trial court’s jurisdiction or participate
 in the judicial process, or insistence on nonsensical and
 nonexistent legal “rights.”

Id. at 461-62, 782 S.E.2d at 94.

 The record indicates at the time this matter came to trial, Defendant was with

 - 26 -
 STATE V. FORTE

 Opinion of the Court

his third attorney, Smith. The trial court appointed Defendant’s first attorney,

Randall Hughes (“Hughes”), in January and February of 2015. Hughes withdrew in

March 2015 after discovering a conflict of interest. The trial court appointed

Defendant’s second attorney, Andrew Boyd (“Boyd”), on 9 March 2015. On 8

December 2015, Defendant asked the court to remove Boyd and appoint a new

attorney. Defendant asserted this was due to ineffective assistance of counsel. Here,

Defendant stated, “It’s been a bit of a conflict of interest from day one, me and him

have not seen eye-to-eye. We go back and forth and get nowhere.” The trial court

denied Defendant’s request at that time, but then allowed Boyd to withdraw on 28

January 2016. At Defendant’s request, the trial court appointed Defendant’s third

attorney, Smith.

 On 5 July 2016, thirteen days prior to trial, Smith filed a motion to withdraw.

In that motion, Smith stated Defendant asked him to withdraw, asserted he and

Defendant had “irreconcilable differences,” and noted the best interests of the parties

would be served by allowing him to withdraw. The trial court heard Smith’s motion

to withdraw on 18 July 2016, the first day of Defendant’s trial.

 Defendant tried to speak twice as the trial court called the case for trial.

Defendant interrupted Smith as Smith addressed his motion to withdraw. Smith

explained to the trial court how Defendant refused to answer Smith’s questions about

the case, and how Defendant frequently interrupted him. Defendant argued with

 - 27 -
 STATE V. FORTE

 Opinion of the Court

Smith about undisputed issues. Defendant also told Smith he would present

evidence, but refused to tell Smith the substance of the evidence. Additionally,

Defendant did not believe Smith’s explanation of the law. Finally, Defendant filed a

complaint against Smith with the State Bar.

 Defendant constantly interrupted the trial court as it tried to explain to

Defendant his right to be represented by counsel. Because Defendant would not allow

the trial court to discuss Defendant’s rights to counsel, the trial court excused

Defendant and Smith from the courtroom in order for Smith to explain involuntary

waiver or forfeiture of counsel. Additionally, in addressing a discovery dispute, the

trial court instructed Defendant to hand up everything he had for the court to review.

Defendant obstructed handing discovery to Smith to hand to the trial court. The

court found Defendant continually interrupted the court for two hours, and he often

refused to listen to questions and answer the questions as the trial court was trying

to go over his right to counsel. The trial court found Defendant was not trying to

understand the process, but was rather just being difficult.

 In finding Defendant had forfeited his right to counsel, the trial court noted

Defendant and his counsel had discussed forfeiture, and Defendant continued to be

argumentative upon returning to the courtroom following the discussion. The trial

court also found Defendant was deliberately difficult with his lawyers and the court.

Defendant couldn’t cooperate with two of his three attorneys. As for Defendant’s

 - 28 -
 STATE V. FORTE

 Opinion of the Court

relationship with his third attorney, the trial court stated:

 [T]he Defendant refuses to answer questions that are
 asked of him, that the Defendant refuses to share with him
 certain documents that the Defendant says he has in his
 possession, that the Defendant argues with him and that
 the Defendant will not listen to him and that he is unable
 to represent him on that basis.

Additionally,

 The Defendant continuously has interrupted the Court as
 the Court asks questions or tries to address the defendant
 or tries to address Mr. Forte regarding his rights to
 Counsel. The Court further finds that the Court gave the
 Defendant’s Counsel, Mr. Smith, and the Defendant and
 opportunity to leave the courtroom to go to a conference
 room to discuss the matter, among other things, the illegal
 forfeiture of Counsel. The Defendant returned to the
 courtroom. The Defendant continues to be argumentative
 with this Court.

 This Court does find that the Defendant has
 deliberately been difficult, not only to his lawyer but
 difficult toward the Court, and that the Defendant refuses
 to listen, that the Defendant when asked direct questions
 tries to answer collateral issues and the Defendant claims
 that he has not been provided discovery.

 Based on the foregoing we conclude Defendant forfeited his right to counsel in

this case. This assignment of error is overruled.

 In his second assignment of error, Defendant contends the trial court erred by

entering judgment for eight counts of felony larceny where all of the property was

stolen in a single transaction. The State concedes the case law clearly states where

multiple items are stolen in a single transaction, there is but one larceny. See State

 - 29 -
 STATE V. FORTE

 Opinion of the Court

v. Adams, 331 N.C. 317, 333, 416 S.E.2d 380, 389 (1992) (“[A] single larceny offense

is committed when, as part of one continuous act or transaction, a perpetrator steals

several items at the same time and place.”). There is nothing in the facts of this case

to distinguish it from controlling authority. Because the eight counts of felony larceny

all involve property stolen during a single transaction, we vacate seven of the felony

larceny convictions. See State v. Boykin, 78 N.C. App. 572, 577, 337 S.E.2d 678, 682

(1985).

 In his third assignment of error, Defendant contends there was a fatal variance

between the indictment for misdemeanor larceny and the evidence at trial.

Defendant acknowledges he did not argue fatal variance at trial as a basis for his

motion to dismiss. Defendant therefore requests this Court to exercise its discretion

to invoke Rule 2 of the Rules of Appellate Procedure to review the alleged variance.

As explained below, we exercise our discretion and invoke Rule 2 in order to address

Defendant’s argument.

 This Court has held a “[d]efendant must preserve the right to appeal a fatal

variance.” State v. Mason, 222 N.C. App. 223, 226, 730 S.E.2d 795, 798 (2012). If the

fatal variance was not raised in the trial court, this Court lacks the ability to review

that issue. Id. at 226, 730 S.E.2d at 798. Rule 2 of the Rules of Appellate Procedure

allows this Court to suspend the rules regarding the preservation of issues for appeal.

However, this Court can invoke Rule 2 only in “exceptional circumstances . . . in

 - 30 -
 STATE V. FORTE

 Opinion of the Court

which a fundamental purpose of the appellate rules is at stake.” State v. Pender, 243

N.C. App. 142, 149, 776 S.E.2d 352, 358 (2015).

 Defendant argues there was a fatal variance between the allegation he stole a

checkbook from Glenn Cox, and the proof at trial, which showed the checkbook

belonged to Cox Auto Salvage. The indictment states:

 The jurors for the State upon their oath present that
 on or about the date of offense shown and in the county
 named above the defendant named above unlawfully,
 willfully and feloniously did break and enter a motor
 vehicle, a 2003 Dodge Ram, vehicle identification number
 1D7HA18DX3J659263, belonging to Glenn F. Cox, which
 contained things of value, with the intent to commit
 larceny therein.

Under North Carolina law, “the indictment in a larceny case must allege a person

who has a property interest in the property stolen and that the State must prove that

that person has ownership, meaning title to the property or some special property

interest.” State v. Gayton-Barbosa, 197 N.C. App. 129, 135, 676 S.E.2d 586, 590

(2009) (quoting State v. Greene, 289 N.C. 578, 584, 223 S.E.2d 365, 369 (1976)).

 While there is no evidence tending to show Glenn Cox was the actual owner of

Cox Auto Salvage, there is ample evidence indicating Cox had a special property

interest in the checkbook. Cox testified the checkbook was his, had his name written

on it, and contained stubs of checks he had written. Cox always kept a company

checkbook, and he realized the checkbook was missing when he needed to pay a

customer. We conclude this evidence establishes Cox was in exclusive possession and

 - 31 -
 STATE V. FORTE

 Opinion of the Court

control of the checkbook, and that he viewed it as being his checkbook. Therefore,

Cox had a special property interest in the checkbook. See State v. Carr, 21 N.C. App.

470, 471-72, 204 S.E.2d 892, 893-94 (1974) (where a car was registered to a

corporation, the son of the owner of that corporation had a special property interest

in the car because he was the sole user of the car and in exclusive possession of it).

This assignment of error is overruled.

 In his final assignment of error, Defendant contends the habitual felon

indictment was fatally defective because the indictment stated Defendant was

charged with one offense and convicted of a different offense. We agree.

 This issue is controlled by State v. Langley, ___ N.C. App. ___, 803 S.E.2d 166,

disc. review allowed, ___ N.C. ___, 805 S.E.2d 483 (2017). In Langley, this Court held

for a habitual felon indictment to comply with N.C. Gen. Stat. § 14-7.3, the indictment

must state the two dates listed for each prior felony conviction: “the date the

defendant committed the felony and the date the defendant was convicted of that

same felony in the habitual felon indictment.” Id. at ___, 803 S.E.2d at 171 (emphasis

in original). “The dates of offense and the corresponding dates of conviction are

essential elements of the habitual felon indictment because of the temporal

requirements of N.C.G.S. § 14-7.1” Id. at ___, 803 S.E.2d at 172.

 The habitual felon indictment in Langley stated, inter alia:

 [2. T]hat on or about October 8, 2009, the defendant did
 commit the felony of Robbery with a Dangerous Weapon,

 - 32 -
 STATE V. FORTE

 Opinion of the Court

 in violation of North Carolina General Statute 14-87, and
 that on or about September 21, 2010, the defendant was
 convicted of the felony of Common Law Robbery in the
 Superior Court of Pitt County, North Carolina[.]

 [3. T]hat on or about August 24, 2011, the defendant did
 commit the felony of Robbery with a Dangerous Weapon,
 in violation of North Carolina General Statute 14-87.1, and
 that on or about May 5, 2014, the defendant was convicted
 of the felony of Common Law Robbery in the Superior
 Court of Pitt County, North Carolina[.]

Id. at ___, 803 S.E.2d at 171.

 This Court held the allegations in the second and third paragraphs of the

habitual felon indictment in Langley failed to comply with N.C. Gen. Stat. § 14-7.3

because the indictment did not provide the offense dates for common law robbery and

instead “alleged offense dates for robberies with a dangerous weapon, and then gave

conviction dates for two counts of common law robbery.” Id. at ___, 803 S.E.2d at 171.

Therefore, this Court concluded the habitual felon indictment failed to comply with

N.C. Gen. Stat. § 14-7.3 because it “did not provide an offense date for the crime the

State convicted Defendant for committing.” Id. at ___, 803 S.E.2d at 172. Because

the habitual felon indictment was facially defective, this Court vacated the

defendant’s status as a habitual felon and remanded for resentencing without the

habitual felon enhancement. Id. at ___, 803 S.E.2d at 172.

 The indictment in the instant case is indistinguishable from the indictment in

Langley. The first paragraph of Defendant’s habitual indictment alleged:

 - 33 -
 STATE V. FORTE

 Opinion of the Court

 [T]hat on or about September 15, 1998, Jimmy Lee Forte,
 Jr. was charged with the felony of Robbery With Dangerous
 Weapon in violation of G.S. 14-87, and that on or about July
 19, 2000, Jimmy Lee Forte, Jr. was convicted of the felony
 of Common Law Robbery in the Superior Court of Wilson
 County, North Carolina[.]

As in Langley, the habitual felon indictment in the current case is facially defective

because the indictment did not allege an offense date for the crime Defendant was

convicted (common law robbery). See id. at ___, 803 S.E.2d at 171-72. Because the

indictment does not comply with N.C. Gen. Stat. § 14-7.3 as interpreted by this Court

in Langley, we vacate the judgment sentencing Defendant as a habitual felon.

 AFFRIMED IN PART, VACATED AND REMANDED IN PART.

 Judge ZACHARY concurs.

 Judge Dietz concurs in a separate opinion.

 - 34 -
 No. COA17-669 – State v. Forte

 DIETZ, Judge, concurring.

 I cannot join in the majority’s decision to invoke Rule 2 of the Rules of Appellate

Procedure to reach Forte’s unpreserved fatal variance argument. “As our Supreme

Court has instructed, we must be cautious in our use of Rule 2 not only because it is

an extraordinary remedy intended solely to prevent manifest injustice, but also

because ‘inconsistent application’ of Rule 2 itself leads to injustice when some

similarly situated litigants are permitted to benefit from it but others are not.” State

v. Bishop, __ N.C. App. __, __, 805 S.E.2d 367, 370 (2017).

 There is nothing extraordinary about this case, and the majority does not even

bother to assert that there is. Indeed, the majority concludes that Forte’s fatal

variance argument is meritless (and I agree). Why then, does the majority invoke the

“extraordinary remedy” of Rule 2, which is limited solely to cases in which it is needed

to prevent manifest injustice? I can’t explain it. But our Supreme Court has explained

the danger of using Rule 2 in cases that are not extraordinary and do not raise issues

of manifest injustice:

 Fundamental fairness and the predictable operation of the courts
 for which our Rules of Appellate Procedure were designed depend
 upon the consistent exercise of this authority. Furthermore,
 inconsistent application of the Rules may detract from the
 deference which federal habeas courts will accord to their
 application. Although a petitioner’s failure to observe a state
 procedural rule may constitute an “adequate and independent
 state ground[ ]” barring federal habeas review, Wainwright v.
 Sykes, 433 U.S. 72, 81, 97 S. Ct. 2497, 2503, 53 L.Ed.2d 594, 604
 (1977), a state procedural bar is not “adequate” unless it has been
 “consistently or regularly applied.” Johnson v. Mississippi, 486
 STATE V. FORTE

 DIETZ, J., concurring

 U.S. 578, 589, 108 S. Ct. 1981, 1988, 100 L.Ed.2d 575, 586 (1988).
 Thus, if the Rules are not applied consistently and uniformly,
 federal habeas tribunals could potentially conclude that the Rules
 are not an adequate and independent state ground barring
 review. Therefore, it follows that our appellate courts must
 enforce the Rules of Appellate Procedure uniformly.

State v. Hart, 361 N.C. 309, 317, 644 S.E.2d 201, 206 (2007).

 The majority’s decision to invoke Rule 2 in a case where there is nothing

extraordinary and no risk of manifest injustice is flatly inconsistent with Supreme

Court precedent. I will not join the majority in further eroding the consistent, uniform

application of our State’s procedural rules.

 2